### In re COMMONWEALTH OIL/TESORO PETROLEUM CORPORATION SECURITIES LITIGATION.

#### M.D.L. No. 347.

United States District Court, W. D. Texas, San Antonio Division.

Jan. 25, 1979.

---

Steven B. Rosenfeld, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Tesoro Petroleum Corporation, Robert V. West, Jr., Robert G. Reed, Charles R. Roberts, James F. Smith, James C. Phelps, Dean M. Bloyd, L. Robert Fullem and John Rote.

Vaughn C. Williams, Skadden, Arps, Slate, Meagher & Flom, New York City, for Gary W. Davis.

George Weisz, Cleary, Gottlieb, Steen & Hamilton, New York City, for Deloitte, Haskins & Sells.

Thomas F. Curnin, Cahill, Gordon & Reindel, New York City, for E. F. Hutton & Co., Inc.

Leo T. Kissam, Kissam, Halpin & Genovese, New York City, for Norman C. Keith.

Robert A. Meister, Milgrim, Thomajan & Jacobs, P. C., New York City, for Commonwealth Oil Refining Company, Inc.

Roger L. Waldman, Webster & Sheffield, New York City, for Peter M. Detwiler.

George J. Wade, Shearman & Sterling, New York City, for George F. Bennett and William A. Lockwood.

Sullivan & Cromwell, New York City, for Sol L. Descartes and J. Howard Laeri.

No appearance for Sergio Camero, Ian K. MacGregor, Dr. Rafael Pico, Tom R. Ragland, Angel M. Rivera and John A. Walstrom.

John E. Skogland, Jr., McGown & McClanahan, San Antonio, Tex., for David Jaroslawicz (A–1).

Richard deY. Manning, Manning & Carey, New York City, for Morton S. Bouchard, et al. (A–2).

Jules Brody, Stull, Stull & Brody, New York City, for Harry Lewis (A–3).

Daniel W. Krasner, Wolf, Haldenstein, Alder, Freeman & Herz, New York City, for Seymour Joseph (A–4).

## MEMORANDUM OPINION AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

## Table of Contents

| | | Page |
|---|---|---|
| I. | NATURE OF THE LITIGATION | 233 |
| II. | BOUCHARD | 235 |
| | A. Facts | 235 |
| | 1. Parties | 235 |
| | 2. Motions | 236 |
| | B. Discussion | 236 |
| | 1. The Federal Claims | 237 |
| | a. Section 14(a) Claims | 237 |
| | b. The 10b–5 Claims | 238 |
| | c. The Section 14(e) Claims | 240 |
| | (i) The Tender Offer Letters | 240 |
| | (ii) The Joint Press Release and Amended Tender Offer | 243 |
| | 2. Summary of Federal Claims | 247 |
| | 3. State Law Claims | 247 |
| | C. Summary | 249 |
| III. | JAROSLAWICZ AND LEWIS | 249 |
| | A. Pertinent Facts | 249 |
| | B. Rule 9(b): Its Requirements and Purposes | 250 |
| | 1. Count I | 251 |
| | a. The Role of the Defendants | 251 |
| | b. Omissions and Misrepresentations | 252 |
| | (i) Omissions | 252 |
| | (ii) Misrepresentations: The Documents and Their Contents | 254 |
| | 2. Count II | 254 |
| | 3. DH&S | 254 |
| | C. 12(b)(6) Motions—Causation | 256 |
| | D. Motion for Summary Judgment | 256 |
| IV. | JOSEPH | 257 |
| | A. Motion to Intervene | 257 |
| | 1. Intervention | 258 |
| | 2. Limitations | 258 |

## I.

## NATURE OF THE LITIGATION

Pursuant to an order of the Judicial Panel on Multidistrict Litigation entered September 26, 1978, four separate actions have been transferred to this court for coordinated or consolidated pretrial proceedings. Three of the actions were originally filed in the United States District Court for the Southern District of New York. They are ·Morton S. Bouchard, et al. v. Tesoro Petroleum Corp., et al, No. 77–Civ.–2037; Harry Lewis v. Norman C. Keith, et al, No. 77–Civ.–3402; and Seymour Joseph v. Peter M. Detwiler, et al, No. 77–Civ.–3809. The other action, David Jaroslawicz v. James C. Phelps, et al, No. SA–78–101, was commenced in the United States District Court for the Western District of Texas.

These actions are brought under the federal securities laws and various common law doctrines, and they focus in large measure upon a 1975 tender offer pursuant to which Tesoro Petroleum Corp. (Tesoro) purchased approximately 5.5 million shares of Commonwealth Oil Refining Co. (Corco), and upon the actions of those corporations and their directors leading up to and following the tender offer.

The primary defendants in these actions are Corco; Tesoro; present and former officers and directors of Corco and Tesoro; E. F. Hutton Co., Inc., the stockbroker that handled the 1975 tender offer for Tesoro (named as a defendant in Bouchard only); and Deloitte, Haskins & Sells, Corco's accountant (named as a defendant in Lewis and Jaroslawicz only). In general, the actions are based on alleged violations of the antifraud provisions of the federal securities laws and upon state law theories of mismanagement and breach of fiduciary duty. Three of the actions—Bouchard, Lewis, and Jaroslawicz—are brought individually and on behalf of various classes of Corco shareholders. The Joseph case is brought by a shareholder of Tesoro who also seeks to represent a class.

·Pretrial motions have been filed in each of the four actions, and these motions are the subject of this Order. Before considering the motions, and before considering in greater detail the scope and nature of each of the cases, a brief chronology of the events and circumstances that underlie the allegations in the various complaints is in order.

The story must begin with a general description of the principal actors. The leading roles are played by the Commonwealth Oil Refining Company (Corco) and the Tesoro Petroleum Corporation (Tesoro). Corco is the largest industry in Puerto Rico. The company is principally engaged in the operation of a major oil refinery and petrochemical complex at Guayanilla Bay on the southern coast of Puerto Rico. The oil refinery, which commenced operation in 1955, has capacity to refine approximately 161,000 barrels per day. The eight petrochemical plants have been added during the years since 1956. Corco is also engaged in several joint ventures in the petrochemical field.

During the 1960's, Corco entered into several fixed-price arrangements—with PPG Industries, W. R. Grace & Co., and the Puerto Rico Water Resource Authority—that largely as a result of rapidly increasing crude oil costs, proved financially harmful. In addition, Corco has been beset with financial difficulties stemming from a perverse confluence of various laws and regulations. The fact that Corco's products have been subject to price controls applicable to oil refined on the mainland United States, coupled with the high cost of transporting Corco oil from Puerto Rico to the mainland (in U.S. vessels carrying U.S. crews in compliance with the Jones Act) has substantially undermined Corco's competitive position in the petroleum industry. In addition, Corco has been subject to an import fee of $2.00 per barrel imposed by the Government of Puerto Rico, a fee which it could not pass on to its customers under federal pricing regulations.

As a result of these and other financial difficulties, during the past several years

Corco's earnings have declined. For the year 1975, for instance, Corco reported a net earnings loss of over 24 million dollars. Eventually, Corco became unable to service its substantial debts, and in March, 1978, filed a voluntary petition under Chapter XI of the Bankruptcy Act in the Western District of Texas.

During the decline of Corco's financial fortunes, significant changes in the control and management of Corco took place. In 1972, defendant Norman C. Keith became president and chief executive officer of Corco, as well as its largest stockholder. Plaintiffs in the *Bouchard* action allege that during his tenure as president, Keith charged to Corco extravagant and unreasonable perquisites amounting to approximately $400,000 per year. By early 1975, perhaps because an arhythmic management pulse was sensed or for other reasons, several corporations became interested in acquiring control of Corco through a tender offer or other means. These included the Ashland Oil Corporation, The Charter Company, and the Tesoro Petroleum Corporation.

On April 18, 1975, Tesoro, an integrated oil company engaged in the exploration, development, and production of oil and gas reserves and in the refining of petroleum products, announced a tender offer for 5.5 million shares of Corco at $11.50 per share. In response to that offer, Keith published two full-page advertisements in the *Wall Street Journal* in the form of letters to Corco shareholders (the Keith tender offer letters) urging rejection of the offer.

In the first of these letters, published April 22, 1975, Keith expressed confidence in Corco's long-term earnings prospects and advised that "three critical problems which have seriously depressed the company's earnings for several years"—the fixed-price contracts mentioned above—"have recently been resolved." Keith added that "[t]he Tesoro offer falls far short of reflecting the potential of Corco's petrochemical facilities," and that the amount offered "is not even equal to the book value, let alone the replacement value."

The April 28, 1975 letter contained substantially the same recommendations against acceptance of the offer and predictions concerning Corco's future. In addition, this letter advised that "the long-term prospects never looked brighter."

On April 23, 1975, Corco filed an action in the United States District Court for the Southern District of New York against Tesoro and E. F. Hutton Co., Inc., alleging violations of the Williams Act and seeking to enjoin Tesoro from pursuing the offer. On April 30, that court (Cannella, J.) entered an order [see *Commonwealth Oil Refining Co., Inc. v. Tesoro Petroleum Corp.*, 394 F.Supp. 267 (S.D.N.Y.1975)] requiring Tesoro to make further disclosures concerning the tax implications of the offer and to extend the duration of the offer.

Sometime after that order, Tesoro agreed to increase its offer to $14.25 per share, and Keith and Corco withdrew opposition to the tender offer. On May 4, 1975, in a joint press release, Corco and Tesoro announced these events. The press release also stated that upon completion of the offer, the companies would "use their best efforts to develop a plan of consolidation of the companies which would be fair and equitable to the remaining shareholders of Commonwealth." The press release further stated that Tesoro had "invited Mr. Keith to join the Tesoro Board of Directors and that Mr. Keith would continue as a director of, and senior consultant to, Commonwealth."

Tesoro amended its tender offer on May 5 to reflect these events. The amended offer contained essentially the same information as the joint press release, adding that Keith would serve "for a period of five years at his current compensation level." In addition, both the press release and the amended tender offer stated that upon completion of the offer the companies would jointly nominate a single slate of candidates for Corco's Board of Directors "in which Tesoro will have a majority of one."

The offer was successfully completed on June 6, 1975. Tesoro purchased 5,505,735 of more than 11 million tendered shares and obtained approximately 37% ownership of Corco.

On July 15, 1975, a new Corco board of directors was elected, the majority of whom were Tesoro nominees, and Corco's executive committee was restructured to reflect the change of control. On that date, James C. Phelps, then president, chief operating officer, and director of Tesoro, was named president and chief executive officer of Corco.

On May 1, 1976, Corco's headquarters moved to San Antonio, Texas, the corporate home of Tesoro. There is some dispute as to when Tesoro effectively took control of Corco, but it is agreed that the correct date lies somewhere between July 16, 1975 and December, 1975. Following Tesoro's acquisition of control of Corco, both companies continued to file customary quarterly and annual reports, as well as occasional press releases relating to the relationship between the companies and the possibility of their consolidation. Several of the plaintiffs in the pending action challenge the adequacy of disclosure in these documents.

During this time, Corco's earnings continued to decline. As a result, Corco borrowed from Tesoro approximately 64 million dollars to meet debt payments and to provide working capital. On October 22, 1976, Tesoro issued a press release announcing that discussions concerning consolidation of the two companies had been deferred pending Corco's "demonstration of its ability to continue to improve its operations and financial results." In addition, Corco was forced to mortgage its refinery complex and to assign its interest in its joint ventures to its principal lenders. Several times Corco had to obtain waivers of or amendments to the terms of its loan agreements due to inability to meet current ratio and earnings covenants in the agreements. On May 16, 1977, Tesoro's board of directors approved a $32,758,000 write-down of the carrying value of Tesoro's investment in Corco stock. Tesoro had made other write-downs during the preceding year totaling approximately 16.7 million dollars. By early 1978, the price of Corco stock had fallen to approximately $3.00 per share.

This chapter of the story ended on March 2, 1978, when Corco filed a voluntary petition in bankruptcy in San Antonio. A new chapter began with the filing of these lawsuits.

## II.

## BOUCHARD

A. *Facts*:

The *Bouchard* action involves sweeping allegations of fraud, mismanagement, and bad faith against many of the parties involved in the affairs of Corco and Tesoro from as far back as 1973 until the late fall of 1976. The suit encompasses both derivative and class action claims; some are alleged to arise under the antifraud provisions of the federal securities laws while others are grounded on state law. As there is no diversity of citizenship, jurisdiction of the state law claims exists, if at all, under the doctrine of pendent jurisdiction. With respect to the class action claims, plaintiffs seek monetary damages, and they seek attorneys', consultants', and accountants' fees with respect to all claims.

### 1. *Parties.*

The scope of the allegations in this action is such that a description of the cast of characters is a necessary backdrop to an understanding of the issues involved.

The plaintiffs can be divided into two categories. The first category will, for simplicity, be called the Bouchard plaintiffs. This group consists of the following persons: Morton S. Bouchard and Marion Bouchard, as executors of the estate of Morton S. Bouchard, Sr.; Morton S. Bouchard and J. George Betz, as Trustees under eight express trusts; Marion Bouchard; and Bouchard Transportation Company, Inc. These plaintiffs sue individually and on behalf of the class of persons who held Corco stock on June 6, 1975, but did not

tender that stock in response to Tesoro's tender offer. The individual plaintiffs themselves acquired their Corco stock prior to March 1, 1973.

The second category of plaintiffs will be called the Dusard plaintiffs. This group consists of Leo F. Dusard, who purchased 1,500 shares of Corco stock in November, 1975, and sold them at a loss in 1977 and who seeks to represent the class of persons who purchased Corco stock between June 6, 1975 and October 22, 1976.[1]

The defendants may, in an attempt to achieve some measure of simplicity, be resolved into four groups. First is the group of corporate defendants, which consists of Tesoro, E. F. Hutton Group, Inc., and Corco.[2] The second group of defendants is comprised of persons elected to the Corco board of directors in 1973 and who continued as directors after Tesoro gained control of Corco. This group will be called the "ongoing Corco directors," and the members are Norman Keith, Sol L. Descartes, J. Howard Laeri, Angel M. Rivera, Sergio Camero, and Dr. Rafael Pico. The third category of defendants consists of directors elected to the Corco board in 1973 but who did not continue as directors after July 15, 1975. This group, the "pre-Tesoro Corco directors," consists of George F. Bennett, Ian K. MacGregor, Tom R. Ragland, and John A. Walstrom and William Lockwood. The final group of defendants consists of persons elected to the Corco board of directors or appointed as officers of Corco on or after July 15, 1975. The members of this group, the "post-tender Corco directors," are Peter M. Detwiler, L. Robert Fullem, Robert G. Reed, Charles R. Roberts, John Rote, James F. Smith, Robert V. West, Jr., and James C. Phelps, all elected to the Corco board on July 15, 1975; Gary W. Davis, named President and Chief Executive Officer of Corco on July 23, 1976; and,

finally, Dean M. Bloyd, elected a director of Corco in December, 1976.

### 2. Motions.

The following defendants, or groups of defendants, have moved under Rules 12(b)(1), 12(b)(6), 9(b), and 56 to dismiss the claims asserted against them: E. F. Hutton & Company, Inc.; the Tesoro defendants (including Tesoro, West, Reed, Roberts, Smith, Phelps, Bloyd, Fullem, and Rote); Detwiler; Keith; Bennett and Lockwood; Rivera; and Descartes, Pico, and Camero. As all of the motions are accompanied by affidavits and documents, they will be considered as motions for summary judgment.

The discussion that follows will not consider each of these motions in isolation; rather, the discussion will focus upon each of the claims asserted by the plaintiffs, and the arguments made in the motions will be considered in the discussion of the claim to which the arguments are directed. At the conclusion of this part of the order, the disposition of each of the motions will be summarized.

### B. Discussion :

As noted above, the plaintiffs in this action have made allegations claimed to arise under both state and federal law. Jurisdiction over the state claims exists, if at all, under the doctrine of pendent jurisdiction. The maintenance of the state law claims depends in large measure, then, upon the disposition of the various challenges to the federal claims. Consequently, the initial focus of this discussion will be upon the claims grounded on federal law, followed by a consideration of the state claims. There will then follow a consideration of several attacks brought against the complaint as a whole, and, finally, a summary of the dispo-

1. The plaintiffs have sought to add as a named plaintiff, Russell W. Iuliano, who purchased 19,900 shares of Corco stock between March 11, 1976 and July 29, 1976, and sold them at a loss in late 1976 and early 1977. Addition of 'Mr. Iuliano as a party, however, must be made by motion to intervene, and not simply by amendment to the complaint. For purposes of

this order, then, Mr. Iuliano is not a named plaintiff in this action.

2. Corco is not named as a defendant in the class action claims, and is only a nominal defendant with respect to the derivative claims. See the discussion below at page 247.

sition of the various motions that are the subject of this order.

### 1. *The Federal Claims.*

a. *Section 14(a) Claims*: The Bouchard plaintiffs assert a derivative claim on behalf of Corco, claiming that Corco was injured by misrepresentations in Corco proxy statements issued in 1973, 1974, and 1975[3] that accompanied solicitation of proxies for the election of Corco directors. Specifically, plaintiffs claim that these proxy statements violated section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1976), and SEC Rules 14a–3 and 14a–9, 17 C.F.R. §§ 240.14a–3, 240.14a–9 (1978) promulgated pursuant thereto. Rule 14a–3 requires, *inter alia*, that proxies solicited on behalf of management for the election of directors be accompanied by a schedule 14A, which consists essentially of broad disclosure of the aggregate renumeration received by officers and directors. Rule 14a–9 is a broad antifraud provision that makes unlawful the issuance of any proxy material containing

> any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading. 17 C.F.R. § 240.14a–9 (1978).

Plaintiffs allege that the 1973, 1974, and 1975 Corco proxy statements understated in material amounts the aggregate renumeration received by Keith as CEO and chairman of the board, that the entire Corco board of directors in those years was elected fraudulently, and that, as a consequence, Corco was deprived of a properly elected board of directors. With respect to the 1973 and 1974 statements, most of the "pre-Tesoro" and "ongoing" Corco directors are named as defendants. With respect to the 1975 statements, the defendants are the "ongoing" and the "post-tender" Corco directors.

The chief problem with this claim, as the defendants to whom it relates have pointed out in their motions, is that the causal link between the proxy statement and the alleged injury to Corco is too attenuated to support a claim for violation of the proxy rules. Even assuming that the proxy statements were materially misleading, any injury Corco suffered as a result of the election of directors for which proxies were solicited was caused by the directors' acts after the election and not by the election itself. The only damage directly attributable to the proxy solicitations—the deprivation of Corco's right to a duly elected board of directors—is too insubstantial to support a claim for relief.

The cases uniformly hold that a claim seeking relief for injuries occasioned by mismanagement or breach of duty is not redressable under the proxy rules simply by virtue of the fact that the acts were committed by directors who would not have been elected but for the proxy solicitation. A party seeking relief under section 14(a) must show transaction causation—that is, that the claimed injury resulted from a transaction directly authorized by the allegedly misleading proxy materials. *See Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

In *Walner v. Friedman*, 410 F.Supp. 29 (S.D.N.Y.1975), plaintiffs brought a derivative claim on behalf of a corporation against the corporation's management, alleging that management had caused the corporation to file misleading financial reports. The court dismissed the allegation of violation of section 14(a) with the following words:

> [T]he misleading proxy statements here did not cause any damage to the corporation in the ordinary sense, in that management obtained authorization of shareholders for corporate actions by means of deceptive or inadequate disclosure there-

---

**3.** There were two proxy solicitations in 1975, since the annual meeting originally scheduled for May 20, 1975 was postponed until July 15, 1975 as a result of the Tesoro tender offer.

in. . . . Here, the damage, if any, will flow from breach of a fiduciary obligation owed as a director or officer, rather than from any shareholder vote obtained by false proxy solicitation materials. 410 F.Supp. at 32.

In *Markewich v. Adikes,* 422 F.Supp. 1144 (E.D.N.Y.1976), plaintiffs complained that defendants' scheme to conceal the true financial condition of an unincorporated association violated section 14(a). In dismissing that claim, the court held as follows:

What the cases clearly hold, however, is that in order to constitute a proxy violation an omission or misrepresentation of material fact must also relate to the purpose for which the proxies are solicited. . . . "[N]o case has gone further and held that the proxy rules are violated because management has allegedly mismanaged the company and the proxy statement does not say so." (citation deleted.) 422 F.Supp. at 1147.

The reasoning of those cases is apposite here, and it is echoed in a number of other decisions. *See, e. g., Epic Enterprises, Inc. v. Brothers,* 395 F.Supp. 773 (N.D.Okla. 1975); *Levy v. Johnson,* 1976–1977 C.C.H. Sec.L.Rep. ¶ 95,899 (S.D.N.Y.1977); *Limmer v. General Tel. & Electronics,* 1977–1978 C.C.H.Sec.L.Rep. ¶ 96,111 (S.D.N.Y.1977); *Wachovia Bank & Trust Co. v. National Student Marketing Corp.,* 461 F.Supp. 999 (D.C.1978).

The Supreme Court in *J. I. Case v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), held that "[t]he purpose of Section 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy statements." It would unduly broaden that purpose to find that the claim made here is cognizable under section 14(a). In fact, such a holding would mean in effect that so long as the directors were elected by means of proxy

solicitations, any act of director mismanagement could be cast as a violation of section 14(a). That would be a wholly unwarranted expansion of the scope of the statutes and rules governing proxy solicitation.

Plaintiffs cite *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir. 1977) for the proposition that a claim of mismanagement falls within the ambit of section 14(a). *Goldberg,* however, was a Rule 10b–5 action involving allegations that a corporate parent deceived its subsidiary, and the central issue was what constituted "deception" under Rule 10b–5. The case certainly does not speak to the causation element of a section 14(a) claim and has no application here.

In sum, because the insufficient causal connection between the alleged injury to Corco and the proxy solicitations upon which the claim is based is facially apparent, the Bouchard plaintiffs have not stated a claim under section 14(a). Therefore, the motions to dismiss and for summary judgment, insofar as they are directed at claims under section 14(a), are granted.[4]

b. *The 10b–5 Claims* : Both groups of plaintiffs assert claims under Rule 10b–5, 17 C.F.R. § 240.10b–5 (1978). The Bouchard plaintiffs' 10b–5 claim merits little attention. They claim that Tesoro, Hutton, West, Fullem, Detwiler, Rote, and "all other participants" violated the rule in their publication of the May 5, 1975, amended tender offer which, according to the complaint, contained material misrepresentations concerning, first, an alleged deal between Keith and Tesoro, and, second, plans to merge the two corporations. The moving defendants urge dismissal of this claim on the ground that the Bouchard plaintiffs fail to meet the standing requirement of *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The point is well taken, and the claim must be dismissed.

---

4. The Dusard plaintiffs allege that the failure of defendants Tesoro, Hutton, Detwiler, Fullem, Reed, Roberts, Rote, Smith, West, Phelps, and Bloyd to correct alleged misstatements in the Keith tender offer letters violated "section 14."

If, as appears to be the case, the basis of this claim is section 14(a), it is dismissed for the same reasons that underlie dismissal of the Bouchard plaintiffs' section 14(a) claims.

■ The Bouchards themselves obtained their Corco stock prior to March 1, 1973, and they and the class they seek to represent held their Corco shares at least beyond June 6, 1975. These plaintiffs neither purchased nor sold securities in response to the alleged misrepresentations in the amended tender offer; they therefore lack standing under *Blue Chip* to assert a claim under Rule 10b–5.

■ The Rule 10b–5 claim asserted by the Dusard plaintiffs presents more difficult issues. The essence of the claim is that after learning of the falsity of statements Keith made in opposition to the tender offer, defendants Tesoro, Hutton, Detwiler, Fullem, Reed, Roberts, Rote, Smith, West, Phelps, and Bloyd failed to correct those statements and thereby violated Rule 10b–5. All defendants against whom the claim is brought seek dismissal on two grounds: first, that Rule 10b–5 imposes no duty on a successful tender offeror to correct the misstatements made by the target company before completion of the offer; and second, that the claim as alleged does not satisfy Rule 9(b)'s specificity requirements. Because Rule 10b–5 did not here impose a duty to correct, defendants' 9(b) argument is not reached.

Mere possession and nondisclosure of material facts does not alone create liability under Rule 10b–5. The 10b–5 duty to tell the whole truth is not an abstraction; it is grounded on relationship and conduct. *Gold v. DCL, Inc.,* 399 F.Supp. 1123, 1127 (S.D.N.Y.1973). The Second Circuit set forth this precept in *Murphy v. McDonnell & Co.,* 553 F.2d 292, 295 (2d Cir. 1977) reasoning, "The [defendants] themselves made no misrepresentations to the plaintiffs. Liability under 10b–5 therefore could be based only upon breach of some duty to disclose." *See Wessel v. Buhler,* 437 F.2d 279, 283 (9th Cir. 1971). Thus, unless the defendants here had some duty of disclosure which they breached, they did not violate Rule 10b–5.

Plaintiffs in this case seek to impose on defendants a duty to disclose misstatements which were made during a tender fight by someone other than the defendants and which the defendants allegedly did not discover to be false until several months after the statements were made. The courts have refused to find a duty to disclose in circumstances less attenuated than these and this court declines to find such a duty in this case.

Courts have held that it would be an intolerable burden to impose on one party to a tender offer the duty to correct misstatements which the other party makes in the heat of the offer. In *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 255 (2d Cir. 1973), the tender offeror failed to reveal either the amount of the judgment rendered against it in favor of the target company, the fact that acceptance of the offer might result in loss of target company's listing on the New York Stock Exchange, or the possible effect of the offeror's failure to vote on proposals to come before the stockholders. The court rejected the offeror's arguments that the target company should have made the disclosures, holding that "the obligation is placed squarely on those making the offer in the first instance to disclose all material factors necessary to make *their offer* not misleading. That duty cannot be shifted to the shoulders of others." *Id.* (Emphasis not added).

Following the *Sonesta* ruling, the Third Circuit reached the same conclusion in *Ronson Corporation v. Liquifin Aktiengesellchaft,* 370 F.Supp. 597, 602 (D.N.J.), aff'd, 497 F.2d 394 (3d Cir.), *cert. denied,* 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974). The court warned that a contrary rule "permitting the offeror to look to the target corporation to correct the deficiencies in the offer," would undermine the purposes of the securities laws.

■ It is also clear that a tender offeror does not have the duty to correct a published misstatement for which it was not responsible. In *Electronic Speciality Co. v. International Controls Corp.,* 409 F.2d 937 (2d Cir. 1969), plaintiffs, including the target company, charged that the tender offeror, International Controls Corporation

(ICC), had an affirmative duty to correct certain misstatements concerning its own holdings which appeared in the *Wall Street Journal.* ICC had reason to think that the statements were attributable to the target company, and plaintiffs did not claim that ICC was the source of the misstatements, 409 F.2d at 949. The Court of Appeals rejected plaintiffs' contention and refused to impose on ICC the duty to correct the misinformation. *See* 2 A. Bromberg, *Securities Laws* § 6.3(415) at p. 116.20 (1977). Other courts have agreed with the Second Circuit and have refused to impose an affirmative duty on a corporation to correct misstatements about it made by third parties. *See Hutto v. Texas Income Properties Corp.,* 416 F.Supp. 478, 482 (S.D.Tex.1976); *Milberg v. Western Pacific Railroad Co.,* 51 F.R.D. 280, 282 (S.D.N.Y.1970), *appeal dismissed,* 443 F.2d 1301 (2d Cir. 1971).

In this case plaintiffs are seeking to place on the Tesoro defendants an even greater burden than the courts refused to impose in the cases discussed above. The Dusard plaintiffs are seeking to impose on Tesoro and its officers and directors a duty not to correct misstatements by others about itself or its offer, but about the company it was seeking to acquire. Even more remote is the claim that Hutton, who was not even a party to the offering but was employed by Tesoro, had a duty to correct Corco's misstatements about itself. Finally, plaintiffs have acknowledged that these defendants were ignorant of the falsity of the statements at the time they were made. This court will not impose a duty to disclose the misleading nature of a statement on parties that were neither the source nor the subject of the statements and were unaware of their falsity at the time of publication. The Dusard plaintiffs' 10b–5 claims are therefore dismissed.

c. *The Section 14(e) Claims*: The Bouchard plaintiffs ground several claims on section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e) (1976). That section, part of the Williams Act (a 1968 amendment to the Securities Act), provides as follows:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. . . .

Plaintiffs bring three claims under section 14(e). The first alleges that the Keith tender offer letters of April 22 and 28, 1975, violated the section, and names Keith, the pre-Tesoro Corco directors, and the ongoing Corco directors as the defendants responsible for the publication of the letters. All of these defendants except for MacGregor, Walstrom, and Ragland [5] (three of the pre-Tesoro Corco directors) have moved to dismiss this claim. The second and third claims under section 14(e) focus respectively upon the May 4, 1975 joint press release issued by Tesoro and Corco, announcing withdrawal of Corco's opposition to the tender offer, and the May 5, 1975 amended tender offer. The second claim is asserted against the same defendants as are named in the first claim as well as Tesoro, Hutton, West, Fullem, Detwiler, Rote, and "all of the other defendants who participated in the preparation thereof," while the third claim is directed against only Tesoro, Hutton, West, Fullem, Detwiler, and Rote. Dismissal and summary judgment as to these claims, too, is urged by all of the defendants, with the same exception noted above.

(i) *The Tender Offer Letters*: The claim based on the tender offer letters alleges that the sanguine statements in those letters concerning Corco's future earnings prospects were false, and were made intentionally or with reckless disregard for the truth. It is further alleged that these letters caused the plaintiffs not to tender

---

**5.** It is not clear whether these particular defendants have been served in this action.

shares, ultimately causing them financial loss.

The defendants' argument in support of dismissal of this claim is essentially twofold. First, defendants argue that a nontendering shareholder may not maintain a suit for damages under section 14(e). Second, they argue that the claim fails to adequately allege a causal nexus between the alleged misrepresentations in the letters and the plaintiffs' injury.

▮ At the outset, it is important to consider whether section 14(e) can be the basis for a claim for damages by any private party, whether tenderer or nontenderer. While the Supreme Court specifically reserved comment on the question in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 42 n.28, 97 S.Ct. 926, 51 L.Ed.2d 124 (1976), the lower federal courts have consistently held that section 14(e) may be the basis for a private claim. In *Sargent v. Genesco, Inc.,* 492 F.2d 750 (5th Cir. 1974), the court wrote that "[a]lthough section 14(e) does not expressly provide for a private right of action, courts have uniformly implied one." The conclusion is a sound one in light of the same considerations that led the Supreme Court to find a private remedy under the proxy rules in *J. I. Case v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), and in light of the fact that section 14(e) tracks in large measure the language of Rule 10b–5 and was enacted at a time when Congress was fully aware that the courts had long been entertaining private damage suits under the rule.

Furthermore, the reasoning of the *Chris-Craft* decision does not preclude implication of a private action for damages under section 14(e) on behalf of a target company shareholder. As the court in *Chris-Craft* emphasized, the legislative history of the Williams Act indicates that the Act was designed specifically for the protection of the investor.

> The legislative history thus shows that Congress was intent upon regulating takeover bidders, theretofore operating covertly, in order to protect shareholders of target companies. 430 U.S. at 28, 97 S.Ct. at 942.

Further inquiry into the legislative history by the court in *Chris-Craft* revealed that another goal of the drafters of the Act was "to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids," *id.* at 31, 97 S.Ct. at 944, *quoting* from 113 Cong.Rec. 24664 (1967), and to avoid discouraging the making of tender offers by threatening potential offerors with the spectre of enormous financial liability. But a private shareholder remedy for damages under section 14(e) would do far less to "tip the scales" or to discourage tender offers than would the creation of a remedy on behalf of tender offerors, the result rejected in *Chris-Craft,* where the Second Circuit had awarded $36 million in damages. Moreover, monetary relief awarded to target company shareholders would in general not redound to the detriment of the shareholders for whose protection the Williams Act was designed, as would have been the case had *Chris-Craft* been permitted to recover under section 14(e).

Finally, and perhaps most importantly, creation of a private damages remedy on behalf of target company shareholders is necessary to effectuate the purposes of the Williams Act, at least absent more widespread SEC involvement in the early stages of takeover activity. As one commentator has pointed out, the "questionable status of attorneys' fees in such cases" makes injunctive relief an unsatisfactory vehicle for enforcing the Act, and, coupled with "the recent retrenchment in the area of class actions, the failure to recognize simplified rights of action for damages on the part of aggrieved target company shareholders could render the protections of the Williams Act a 'share and a delusion.' " Pitt, *Standing to Sue Under the Williams Act,* 34 Bus.L. 117 (1978). In sum, *Chris-Craft* does not preclude creation of a private damages remedy under section 14(e) on behalf of target company shareholders, and the creation of such a remedy is a reasonably necessary means of effectuating the purposes of the Williams Act.

The remedy, moreover, should extend to nontendering as well as tendering shareholders. Indeed, prior to *Chris-Craft,* the private remedy under section 14(e) had generally been held to extend to persons who were confronted with a tender offer but as a result of misrepresentations by the offeror or by the target company, did not accept it.[6] One year after the statute was enacted, the Second Circuit in *Electronic Specialty Co. v. International Controls Co.,* 409 F.2d 937 (2d Cir. 1969), a suit for an injunction, held that a nontendering stockholder had standing to sue for violations of section 14(e).

> While a nontenderer suffers no immediate injury from inadequacy of price in the sense that he retains his stock, such inadequacy is likely to have a depressing effect on the market for some time and thus may hurt him if, for one reason or another, he should later find it necessary or desirable to sell. 409 F.2d at 946.

In *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974), the Fifth Circuit reached a similar conclusion:

> To charge violations of Section 14(e) in federal court a private plaintiff need not be a purchaser or seller of any securities, as he must be to sue under Rule 10b–5. This is the primary contribution of the Williams Act to the antifraud arsenal; under Section 14(e) a plaintiff may gain standing if he has been injured by fraudulent activities of others perpetrated in connection with a tender offer, whether or not he has tendered his shares. 489 F.2d at 596.

Other courts have reached the same result, *see, e. g., Hurwitz v. Jones Corporation,* 76 F.R.D. 149 (W.D.Mo.1977), and the result is sound, though not entirely without dispute.[7] Nor is the force of these decisions permitting a nontendering stockholder standing under 14(e) significantly diminished by recent Supreme Court decisions narrowing the scope of actions under Rule 10b–5. Section 14(e) does not contain the "in connection with the purchase or sale of any security" language of Rule 10b–5. Hence the reasoning of the decision in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) is not directly applicable to the question of standing under 14(e). Moreover, many of the concerns expressed by the court in *Blue Chip* are inapposite to analysis of the 14(e) action. Most importantly, absent a purchaser-seller limitation, the possibility of a boundless class of nonpurchasing or nonselling plaintiffs seeking relief for violations of the securities laws does not exist under section 14(e) as it might under Rule 10b–5. The class of nontendering shareholders is limited to the persons actually confronted with the offer, that is, holders of target company stock at the time the offer was made.

The reason for imposing a strict purchaser-seller requirement in Rule 10b–5 actions was set out by the court in *Blue Chip* as follows:

> The virtue of the *Birnbaum* rule, simply stated, is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates. And their dealing in the security, either by way of purchase or sale, will generally be an objectively demonstrable fact in an area of the law otherwise very much dependent upon oral testimony. 421 U.S. at 747, 95 S.Ct. at 1931.

The Bouchard plaintiffs, and nontendering shareholders in general, "have at least dealt in the security to which the . . . representation relates," and "their dealing in the security" is an objectively demonstrable fact. The reasoning of *Blue Chip,* then, does not mandate exclusion of nontendering shareholders from the class of plaintiffs

---

6. This question, too, was raised but not answered by the Supreme Court in *Piper,* 430 U.S. at 38, 97 S.Ct. 926.

7. At least one court has refused to allow a nontendering stockholder to sue for damages under section 14(e). *See Neuman v. Electronic Specialty Co.,* 1969–1970 C.C.H.Fed.Sec.L.Rep. ⁋ 92,591 (N.D.Ill.1969).

who may sue under section 14(e).[8] It follows that the Bouchard plaintiffs have standing to assert claims under section 14(e).

The second ground upon which dismissal of this claim is urged is that the plaintiffs have failed to allege that their injury was caused by the alleged misrepresentations in the letters. Plaintiffs do, however, allege that they "suffered damage" by not tendering their stock to Tesoro, and the inescapable inference from the first section 14(e) claim is that the Keith tender offer letters were a cause of their failure to tender.

■■ While it is true that causation is an essential element of a claim under the antifraud provisions of the security laws, *see, e. g., Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), summary disposition of a claim for failure to show causation is proper only where no substantial question of fact is raised as to whether the plaintiffs' injury was caused by the alleged misrepresentations. Plaintiffs here have claimed that the alleged misrepresentations in the tender offer letters were the cause of their failure to tender, and, consequently, the cause of their injury. The defendants have not opposed that claim of causation with either affidavits or other documents. Rather, the defendants argue that the tender offer letters of April 22 and 28 could not have been the cause of a failure to tender shares in light of Keith's withdrawal of opposition to the tender offer in the May 4 joint press release. The problem with the argument is that, while the withdrawal of opposition to the offer may have indicated that Keith believed that the amended offer of $14.25 per share was adequate, it did not retract or even significantly diminish the force of the statements made in the letters concerning Corco's future earnings prospects. Hence a reasonable shareholder might have continued to be misled by the letters and might have refus-

ed the tender offer on the basis of them. In sum, it cannot be said on the basis of the pleadings and documents submitted to date that the failure of the Bouchard plaintiffs to tender their shares was not caused by the Keith tender offer letters. The question of causation, although defendants seem now to have the better of the argument, is one of fact that must be resolved at trial. Consequently, the section 14(e) claim based on those letters cannot be dismissed.

(ii) *The Joint Press Release and Amended Tender Offer:* The second and third claims brought by the Bouchard plaintiffs under section 14(e) focus upon the May 4, 1975, joint press release in which Corco withdrew its opposition to the Tesoro tender offer, and the May 5, 1975, amended tender offer. Plaintiffs allege that both of these documents contained fraudulent misrepresentations concerning, first, an alleged agreement between Keith and Tesoro and, second, the announced intention of Corco and Tesoro to work toward a consolidation of the two companies. With respect to the consolidation plan, the allegation is simply that defendants Tesoro, Hutton, Detwiler, West, Fullem, and Rote "lacked sufficient knowledge of Corco and its financial condition to make any representation with respect to such a consolidation."

Before reaching the defendants' arguments in support of dismissal of this claim, it is instructive to note their somewhat anomalous nature. The drafters of both the press release and the amended tender offer clearly aimed to induce shareholders to tender; yet plaintiffs claim that they were fraudulently induced not to tender their shares. More precisely, they contend that, had they been fully informed as to the nature of the agreement between Keith and Tesoro (plaintiffs allege that Keith was to receive $182,000 per year as salary plus $400,000 per year in perquisites), and had

---

**8.** *See* A. Bromberg, Securities Law: Fraud § 6.3 (1974):

[T]he nontendering security holder may be in even greater need of protection than the one who tenders. In enacting 14(e), Congress showed as much concern for the nontenderor

as for the tenderor, not only by eliminating the "purchase or sale" phrase which 10b–5 uses, but in its discussion of the need for legislation. [citation deleted.] It follows that the nontendering security holder has standing under 14(e) even if he does not under 10b–5.

they known that Keith's salary was to be paid from Corco funds, they would have tendered their shares.[9] Plaintiffs further contend that they would have been more likely to tender their shares if the true prospects for consolidation of the companies had been disclosed.[10]

These allegations are sufficient to raise fact questions as to whether these plaintiffs were misled by the press release and amended offer; it cannot be said, as defendants urge, that as a matter of law they were not misled. What section 14(e) requires is simply a misleading statement or omission of a material fact made with intent to deceive in connection with a tender offer. It does not require that a stockholder be misled in the way that the alleged wrongdoer intended. That is, liability is not predicated upon specific intent to induce a stockholder to act in a certain way, but rather upon general intent to deceive. While there may also be a requirement that the stockholder have acted reasonably in response to the alleged misrepresentations, see, e. g., Dupuy v. Dupuy, 551 F.2d 1005 (5th Cir. 1975), it is not possible to determine on the basis of the pleadings and documents submitted that the plaintiffs' response to the alleged misrepresentations was unreasonable. It cannot be determined as a matter of law that the plaintiffs' response to the announcement of consolidation plans was unreasonable, even though that announcement may have been calculated to induce stockholders to tender their shares. The plaintiffs might, for instance, reasonably have hoped for a higher offer for their Corco shares upon consolidation of the companies.

Moreover, the fact that the vast majority of Corco shareholders did tender their shares[11] does not, as some defendants argue, negate the possibility that the plaintiffs here were induced to refuse the offer, though such evidence may weigh heavily at trial against the conclusion that these materials were misleading. The important point for purposes of this motion is that the plaintiffs have raised a substantial question of fact as to whether they were misled by alleged misrepresentations in the joint press release and the amended tender offer.

The moving defendants challenge the maintenance of these claims on several other grounds. All of the defendants argue that the Bouchard plaintiffs lack standing to sue under section 14(e) because they did not tender their shares. That issue has been discussed and resolved in favor of the plaintiffs.

In addition, the defendants argue that the misrepresentations and omissions alleged by plaintiffs are not material as a matter of law. The Supreme Court in *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), set out the test of materiality for suits under section 14(a) of the Act, a test that must logically be considered applicable to all of the antifraud provisions of the federal securities laws.

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]. . . . What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have

9. The joint press release stated simply that "Tesoro has invited Mr. Keith to join the Tesoro Board of Directors and . . . Mr. Keith [will] continue as director of, and senior consultant to, Commonwealth." The amended tender offer gave the same information, but added that Keith would serve "for a period of five years at his current compensation level."

10. Both the joint press release and the amended tender offer stated that "Tesoro and the

Company have agreed that, promptly upon the completion of the offer, they will use their best efforts to develop a plan of consolidation of the two companies on terms which would be fair and equitable to the remaining stockholders of the company."

11. Tesoro's offer to purchase 5,500,000 shares was substantially oversubscribed. More than 11 million of some 14 million outstanding shares were tendered.

been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. 426 U.S. at 449, 96 S.Ct. at 2132.

While *TSC* involved review of a decision that an alleged omission *was* material as a matter of law, there may certainly be cases where such an omission would be immaterial as a matter of law. In fact, the court in *TSC* recognized that "[t]he issue of materiality may be characterized as a mixed question of law and fact," *id.* at 450, 96 S.Ct. at 2132, and went on to hold that:

> Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment. [citations omitted]. *Id.* at 450, 96 S.Ct. at 2133.

It follows that the argument of the moving defendants here that the omissions alleged are not material can prevail only if the omissions are so obviously *unimportant* to an investor that reasonable minds cannot differ on the question of materiality.

To be sure, there are cases where the conclusion can be drawn without benefit of a trial that alleged omissions would not have influenced a reasonable investor; but the conclusion cannot be drawn here. It cannot be concluded, on the basis of the documents submitted, that a reasonable investor would not have been influenced by disclosure of either the alleged agreement between Keith and Tesoro or of the alleged unfeasibility of consolidation of the two companies. A similar argument that alleged nondisclosures were immaterial as a matter of law was rejected in *SEC v. Joseph Schlitz Brewing Co.,* 452 F.Supp. 824 (E.D.Wis.1978). The court there, citing *TSC,* refused to find that certain nondisclosures of illegal payments were immaterial as a matter of law, even though the amount of the payments was relatively small. *See also Alton Box Board Co. v. Goldman, Sachs & Co.,* 560 F.2d 916 (8th Cir. 1977); *McNally v. Esmark, Inc.,* 427 F.Supp. 1211 (N.D.Ill. 1977). At this stage, then, it cannot be

determined that the alleged nondisclosures in the May 4, 1975 press release and the May 5, 1975 amended tender offer are immaterial, and the claims based on those documents cannot be dismissed on that ground.

The Tesoro defendants and Hutton further argue that, as to them, these claims do not sufficiently allege scienter as to state a claim under section 14(e). It is settled, of course, that scienter—fraudulent intent to deceive—is an essential element of a private antifraud claim under the Securities Exchange Act. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The requirement, moreover, is that the plaintiffs allege knowledge of the fraud, and not simply knowledge of the facts underlying the fraud. *See, e. g., Murphy v. McDonnell & Co.,* 553 F.2d 292 (2d Cir. 1977).

The scienter requirement, then, is a stringent one, but it is often difficult to determine the question of scienter before trial. With respect to the alleged misrepresentations concerning the plans for consolidation, however, the plaintiffs fail on the face of their complaint to meet the scienter requirement as to certain defendants. The complaint simply alleges that with respect to the consolidation plans, Hutton, Tesoro, Detwiler, West, Reed, Roberts, Smith, Phelps, Bloyd, Fullem, and Rote "lacked sufficient knowledge of Corco and its financial condition to make any representation with respect to such a consolidation." This allegation fails on its face to meet the standard of *Hochfelder.* Insofar as these section 14(e) claims relate to the representations concerning consolidation plans, then, they must be dismissed as to Hutton, Detwiler, and the Tesoro defendants.

More difficult issues are raised by the allegations relating to the defendants' failure to disclose fully the details of an alleged agreement between Keith and Tesoro. With respect to those claims, the complaint, read with reasonable charity, alleges scienter as to Hutton and the Tesoro defendants. Scienter, in fact, is implicit in the claim

against the Tesoro defendants in light of the fact that Tesoro was one of the parties to the alleged agreement. The Tesoro defendants cannot reasonably claim that they lacked knowledge of an agreement between Tesoro and Keith, if indeed such an agreement existed, and they do not argue that the failure to disclose such an agreement in the press release or amended tender offer was unintentional. As to those defendants, then, the allegations concerning the alleged agreement cannot be dismissed by reason of failure to meet the scienter requirement.

A more difficult question of scienter exists as to defendants Hutton and Detwiler.[12] Detwiler has submitted an affidavit in which he states:

I did not participate in the drafting of the Joint Press Release of Tesoro Petroleum Corporation and Commonwealth Oil Refining Company ("Corco") dated May 4, 1975, or in the drafting of the Amendment to Offer to Purchase Shares of Corco Common Stock dated May 5, 1975.

Hutton has submitted the affidavit of William P. Nicoletto, vice president in the corporate finance department of E. F. Hutton & Co., Inc., wherein Mr. Nicoletto states that:

To the best of my knowledge, information and belief, Hutton did not participate in the drafting of the Joint Press Release . . . or in the drafting of the [Amended Tender Offer].

Plaintiffs counter these affidavits only with the affidavit of Robert S. Whitlow, former general counsel of Corco, in which Whitlow states, in relevant part, as follows:

I first met Detwiler on May 4, 1975; this was the day the draft of the "Joint Press Release" regarding the amended Tesoro tender purportedly was prepared. I do not know whether Detwiler participated in the drafting of that document, but I do know that he saw it in my presence in Keith's office following the adjournment of the Corco board meeting . . . in its original form, and that

Detwiler was present when one or more amendments were made in the draft "Joint Press Release."

The question for decision here is whether, in light of these affidavits, plaintiffs have produced "significant probative evidence . . . demonstrating that a genuine issue of fact exist[s]" as to the scienter element of the claim against Detwiler and Hutton. *Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778, 782 (5th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975). As the Whitlow affidavit makes no mention of the May 5 amended tender offer, there is no substantial fact question concerning Hutton's and Detwiler's participation in the publication of that document. Hutton and Detwiler are therefore entitled to summary judgment on the 14(e) claims based upon the amended tender offer.

As to the joint press release, there is simply Whitlow's statement that Detwiler saw the document. Read against the sworn statement by Detwiler that he did not participate in drafting the press release, Whitlow's statement does not constitute "significant probative evidence" sufficient to raise a genuine question of fact concerning the scienter element of the claim against Hutton and Detwiler. *Scranton Construction Co. v. Litton Industries Leasing Corp., supra*. See also *United States v. Pent-R-Books, Inc.*, 538 F.2d 519 (2d Cir. 1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977). Consequently, the motions of Hutton and Detwiler for summary judgment with respect to claims based upon the joint press release and the amended tender offer must be granted.

Finally, several defendants argue that any misrepresentations in the joint press release or amended tender offer were corrected by disclosures in later documents beginning in August, 1975, and that, since these later adverse disclosures did not induce the plaintiffs to sell their shares, similar adverse disclosures in the tender offer

12. Detwiler was a director of Tesoro and vice chairman of the board of directors of E. F. Hutton Group, Inc., Hutton's corporate parent.

documents would not have caused them to tender. One of the problems with the argument is that at the time of the later documents, the price of Corco stock had dropped to $11 per share or lower, so that the decision that confronted the plaintiffs in May of 1975 was significantly different than that which confronted them in later months. It cannot be concluded, then, on the basis of the plaintiffs' failure to sell in August, that they would not have tendered their shares in May if they had been afforded the benefit of disclosure of the allegedly misrepresented facts. Moreover, the adverse disclosures of later months may not have been sufficient to overcome the impact of the statements in the May, 1975 documents. The fact and timing of later disclosures may, of course, have significant bearing upon the extent of defendants' liability, should that issue ever arise.

### 2. Summary of Federal Claims.

Only the Bouchard plaintiffs have raised a claim under federal law that survives the various motions to dismiss and for summary judgment. The Bouchard plaintiffs surviving claims arise under section 14(e) of the Act. The first of these is a class action claim alleging that Keith, the ongoing Corco directors, and the pre-Tesoro Corco directors violated section 14(e) in their publication of the tender offer letters of April 22 and 28, 1975.

The second surviving claim, also a class action claim, is based upon the May 4, 1975, joint press release and focuses upon two alleged misrepresentations in that document. As to the first of these misrepresentations—the alleged agreement between Keith and Tesoro—a claim survives as to all of the defendants specified in the claim except Hutton and Detwiler. As to the alleged misrepresentation of plans to consolidate the companies, a claim survives only against Keith, the ongoing Corco directors, and the pre-Tesoro Corco directors.

The third and final surviving claim is based upon the May 5, 1975, amended

tender offer, and is asserted against Hutton, Tesoro, West, Fullem, Detwiler, and Rote. This claim, too, is dismissed as against Hutton and Detwiler; as to the other defendants, only the portion of the claim that concerns statements in the offer relating to the alleged agreement between Keith and Tesoro survives dismissal.

Finally, no valid claim is asserted against defendant Gary W. Davis, who was not involved in the affairs of either Corco or Tesoro until some time after the events that are the subject of the surviving claims.[13]

### 3. State Law Claims.

The Bouchard plaintiffs bring a panoply of allegations of mismanagement and breach of fiduciary duty that arise under state law. Federal jurisdiction of these claims is based solely upon the doctrine of pendent jurisdiction, and the decision as to whether the state law claims asserted here fall within the purview of the doctrine must be made with reference only to those federal claims that have survived the motions for dismissal and summary judgment.

The familiar refrain of the pendent jurisdiction doctrine, as written by the Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), is that the jurisdiction may be exercised where the state and federal claims arise out of "a common nucleus of operative fact." Application of that standard, however, does not end the inquiry as to whether pendent jurisdiction should be exercised over state law claims. A court must also consider judicial economy, fairness to litigants, the predominance, if any, of state law issues over federal issues, as well as the possible confusion of the jury that might result from trying the claims together. It is with these principles in mind, then, that the question of jurisdiction over the state law claims must be resolved.

The first state law claim advanced is a derivative claim alleging that between

---

**13.** Davis was elected President and Chief Executive Officer of Corco on July 23, 1976. He previously had had no involvement with either Corco or Tesoro.

1973 and 1975, Keith, the ongoing Corco directors, and the pre-Tesoro Corco directors breached their fiduciary duty to Corco by permitting Keith to take unreasonable executive perquisites at Corco's expense. The focus of this claim is upon events that took place primarily before the publication of the documents that are the subject of the surviving federal claims. In that sense, exercise of jurisdiction over this claim would significantly expand at least the temporal scope of this lawsuit. On the other hand, much of the evidence that would support this state law claim would also be relevant to the federal claim concerning the alleged agreement between Keith and Tesoro, which also involves the question of Keith's perquisites. The question of whether to exercise jurisdiction, then, is a difficult one. But the fact that the state claim of breach of duty over a period of several years substantially predominates over the much more precise federal claim of nondisclosure in two specified documents counsels strongly against hearing the state claim. Accordingly, this claim of breach of fiduciary duty is dismissed without prejudice to its assertion in a proper state court.

In their second claim under state law, the Bouchard plaintiffs allege that Keith, the ongoing and pre-Tesoro Corco directors, and later Hutton and the Tesoro defendants willfully and negligently mismanaged the affairs of Corco by causing it to enter into various improvident business arrangements. As the facts underlying this claim reach far beyond the dimensions of the federal claims, there is no basis for exercising pendent jurisdiction over it. The claim is accordingly dismissed without prejudice to its assertion in a proper state court.

The plaintiffs also seek to bring a derivative claim on Corco's behalf against Keith and the ongoing and pre-Tesoro Corco directors alleging that they acted in bad faith in bringing the April 23, 1975, lawsuit to enjoin Tesoro from pursuing its tender offer. The factual allegations of this claim are closely tied to the Keith tender offer letters that are the subject of one of the surviving federal claims; in fact, the suit to enjoin Tesoro was filed one day after the first tender offer letter. Moreover, both claims involve the question of Keith's intent to mislead both Tesoro and stockholders of Corco with respect to Corco's value and the adequacy of the tender offer. Finally, this state claim neither predominates over the federal claim concerning the tender offer letters nor significantly broadens the scope of this case. For these reasons, pendent jurisdiction may properly be exercised over the state claim alleging bad faith in the institution of the lawsuit to enjoin the Tesoro tender offer.

The final claim asserted under state law, again a derivative claim, alleges that Keith, and the ongoing and pre-Tesoro Corco directors violated their fiduciary duty to Corco by failing to give adequate consideration to and disclosure of competing offers to purchase Corco stock or to merge with Corco made by Ashland Oil, Inc. and the Charter Company. This claim, too, focuses upon events surrounding the tender offer that is the basis of the federal claims. The facts necessary to support the claim are closely connected to the facts that underlie the federal claims—the common basis of the claims is the Corco directors' reaction to and handling of the tender offer. This claim too, then, is a proper one for the exercise of pendent jurisdiction.

One last argument must be addressed. Several defendants, citing *Caan v. Kane-Miller Corp.*, 78 Civ. 878 (S.D.N.Y.) and *Diana v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1977–1978 C.C.H. Fed.Sec.L. Rep. ¶ 96,194 (S.D.N.Y.1977), argue that the plaintiffs here may not bring both derivative and direct claims for relief in the same action. The question is really one of adequate representation, *see Bertozzi v. King Louie Intern, Inc.*, 420 F.Supp. 1166 (D.R.I. 1976), and the gist of defendants' argument is that the plaintiffs and their attorneys cannot adequately represent both the class of nontendering Corco shareholders seeking to recover damages against Corco as well as Corco itself in the derivative action. Some courts appear to have adopted a rule that such an arrangement constitutes a per se

conflict of interest, *see, e. g., Caan v. Kane-Miller Corp., supra,* while others have chosen to treat the question on a case-by-case basis, *see, e. g., Bertozzi v. King Louie Intern, Inc., supra.*

In this case, however, the plaintiffs seek no direct relief against Corco, and Corco is named as a defendant for derivative purposes only. In light of that fact, it would be wholly improper to find a conflict at this stage. Questions of adequate representation will be resolved at the class certification stage of this proceeding.

### C. *Summary:*

The effect of this order is that the Hutton and Detwiler and Davis motions for summary judgment are granted in their entirety; and the other motions to dismiss and for summary judgment are denied as to the following claims, and granted as to all others.

1. The Bouchard plaintiffs' class action claim under section 14(e) of the Securities Exchange Act against Keith, the pre-Tesoro and ongoing Corco directors alleging misrepresentations in the April 22 and 28, 1975, tender offer letters.

2. The Bouchard plaintiffs' class action claims under section 14(e) against Keith, the ongoing and pre-Tesoro Corco directors, Tesoro, West, Fullem, and Rote alleging omission of facts relating to an alleged compensation agreement between Keith and Tesoro from the May 4, 1975, joint press release.

3. The Bouchard plaintiffs' class action claim under section 14(e) against Tesoro, West, Fullem, and Rote alleging omission of facts relating to an alleged compensation agreement between Keith and Tesoro from the May 5, 1975, amended tender offer.

4. The Bouchard plaintiffs' class action claim under 14(e) against Keith, the ongoing and pre-Tesoro Corco directors alleging misrepresentations with respect to a plan to consolidate Corco and Tesoro in the May 4, 1975, joint press release.

5. A derivative claim brought by the Bouchard plaintiffs against Keith and the ongoing and pre-Tesoro Corco directors alleging breach of fiduciary duty in failing to consider offers by Ashland Oil, Inc. and the Charter Company to purchase Corco shares or to merge with Corco.

6. A derivative claim brought by the Bouchard plaintiffs against Keith and the ongoing and pre-Tesoro Corco directors alleging bad faith in instituting a lawsuit on April 25, 1975, to enjoin Tesoro from pursuing its tender offer.

### III.

### JAROSLAWICZ AND LEWIS

### A. *Pertinent Facts:*

Plaintiffs Jaroslawicz and Lewis are suing individually and on behalf of classes of persons purchasing Corco securities from November 1, 1975 through January 28, 1977. Jaroslawicz originally brought suit in the Western District of Texas; Lewis filed his claim in the Southern District of New York. After the actions were transferred to this court by the Multidistrict Litigation Panel, the two plaintiffs filed amended complaints which are the subject of this opinion.

The complaints are, with two exceptions, identical. First, the individual defendants differ slightly. Second, Jaroslawicz who allegedly purchased 1,000 shares of Corco's common stock on July 30, 1976, claims to represent all purchasers of common stock during the class period. Lewis, who allegedly purchased 20 shares of Corco's convertible fixed income securities on December 31, 1976, claims to represent all persons purchasing such securities during the class period. Although originally Deloitte Haskins & Sells (DH&S) was only named as a defendant in *Jaroslawicz,* it now has been named as defendant in both amended complaints.

Plaintiffs allege that the defendants violated section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 by omitting from a variety of reports and statements certain material facts concerning Corco's financial condition and future

prospects and by including instead a number of misstatements and misleading statements. Defendants contend that because the complaints neither comply with the specificity requirements of Rule 9(b), Fed.R. Civ.P. nor allege reliance, they should be dismissed. They also request summary judgment on the ground that three matters which plaintiffs allege were omitted were in fact disclosed. This court concludes that parts of plaintiffs' complaints lack the specificity which Rule 9(b) requires; that plaintiffs have adequately alleged causation; and that summary judgment for defendants is inappropriate.

**B. Rule 9(b): Its Requirements and Purposes:**

Rule 9(b) states, in pertinent part, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Under this rule, "the facts and circumstances constituting charged fraud must be specifically demonstrated and cannot be presumed . . ." *Howard v. Sun Oil Co.,* 404 F.2d 596, 600 (5th Cir. 1968). The specificity requirement of Rule 9(b) stands in contrast to the liberal federal pleading requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2), Fed.R.Civ.P. Rule 9(b) does not render Rule 8 inapplicable to fraud cases, however. Rather, the two rules must be reconciled. *Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir. 1975); *Felton v. Walston & Co., Inc.,* 508 F.2d 577, 581 (2d Cir. 1974). *See,* 5 C. Wright and A. Miller § 1298. Courts have not struck a balance between these rules by devising an easily applied test. Indeed, despite the many applications of Rule 9(b), no standard has evolved dictating precisely now much notice the rule requires. No court has enunciated a test which casts light beyond the facts before it. This is not surprising. The nature of each individual case will necessarily determine the degree of specificity which under Rule 9(b) is appropriate.

The focal point of a Rule 9(b) inquiry should be whether, given the nature and facts of the case and the circumstances of the parties, the pleading in question is sufficiently particular to satisfy the purposes of Rule 9(b). The rule has three purposes. First, it ensures that the allegations are specific enough to inform a defendant of the act of which the plaintiff complains and to enable him to prepare an effective response and defense. *Felton v. Walston & Co., Inc., supra; Dudley v. Southeastern Factor & Finance Co.,* 446 F.2d 303, 308, n. 6 (5th Cir. 1971); *Richardson v. White, Weld & Co.* [Current] Fed. Sec.L.Rep. (C.C.H.) ¶ 96,448 (S.D.N.Y.1978). Second, it eliminates those complaints filed "as a pretext for discovery of unknown wrongs." *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1087 (S.D.N.Y. 1977). The Second Circuit explained: "A complaint alleging fraud should be filed only after a wrong is reasonably believed to have occurred; it should seek to redress a wrong, not to find one." *Segal v. Gordon,* 467 F.2d 602, 607–08 (2d Cir. 1972). A plaintiff in a non-9(b) suit can sue now and discover later what his claim is, but a Rule 9(b) claimant must know what his claim is when he files it. Third, Rule 9(b) seeks to protect defendants from unfounded charges of wrongdoing which injure their reputations and goodwill. *Id.* at 607, 5 C. Wright & A. Miller, Federal Practice & Procedure § 1296. This policy is particularly important to defendants such as DH&S who are "in fields of expertise which are sensitive to claims of fraud." *Gilman Brothers, Inc. v. Peat, Marwick, Mitchell & Co.,* [Current] Fed.Sec.L.Rep. (C.C.H.) ¶ 96,512 (S.D.N.Y. 1968) at 93,994.

Courts must be sensitive to the balancing exercise which Rule 9(b) requires. The rule invites abuse by both plaintiffs and defendants. An unbalanced application on the one hand gives plaintiffs unchecked access to the in *terrorem* power of the federal discovery mechanism[14] or on the other hand

14. A sufficient allegation is the ticket to the discovery mechanism. Refined or new allegations may come out of that discovery and cou- pled with liberal standards for amendment, the focus of the lawsuit may shift.

allows defendants by sophistical claims of ignorance, to plow meritorious claims into stumps. This court recognizes that "the artless drafting of a complaint should not allow for the artful dodging of a claim." *Morse v. Peat, Marwick, Mitchell and Co.,* 1975–76 (C.C.H.) Fed.Sec.L.Rev. ¶ 95,492 (S.D.N.Y.1976). It also is guided by Fifth Circuit decisions in which the court has upheld less-than-perfect complaints if, "after a search in the pleadings for the particulars . . . they can be found." *Kohler v. Jacobs,* 138 F.2d 440, 443 (5th Cir. 1943); *see McGuire v. Sadler,* 337 F.2d 902, 905 (5th Cir. 1964). The enforcement of Rule 9(b) should not become a throwback to the Field Code or a tool to require plaintiffs repeatedly to redraft pleadings despite the defendants' pre-existing full knowledge of the matters which plaintiffs' pleading addresses. Therefore, if under the circumstances of the case it is apparent that even though plaintiffs' pleadings are vague, the defendants do in fact have notice of the matters of which plaintiffs complain, a strict application of Rule 9(b) can serve no purpose. The 9(b) attack here will be reviewed with these general observations in mind. ·

1. *Count I.*

a. *The Role of the Defendants:* The defendants in *Lewis* and *Jaroslawicz* include Corco, various officers and directors of both Corco and Tesoro, DH&S and Tesoro, Corco's principal stockholder. In Count I plaintiffs seek recovery from all defendants, yet fail to set forth the specific acts which any particular defendant allegedly committed. In ¶ 21, plaintiffs contend "each defendant . . . has either engaged or conspired in, aided and abetted, or wilfully or recklessly permitted or acquiesced in all or part of the unlawful acts charged herein, or is liable as a controlling person of one who has so acted." Similarly, in ¶ 27, the plaintiffs charge "all of the defendants, directly or indirectly, made, promulgated, assisted, aided, abetted, adopted, or ratified the foregoing omissions and misleading statements

concealing the true facts thereof. The aforesaid acts and omissions were pursuant to a conspiracy among and between at least some of the defendants."

 Plaintiffs contend they have sufficiently identified defendants and rely for authority on *In Re Equity Funding Corp. of America Securities Litigation,* 416 F.Supp. 161, 181 (C.D.Cal.1976). In that case the court stated that "once a complaint has adequately identified a particular defendant with a category of defendants allegedly responsible for some continuing course of conduct, [it is unnecessary] to plead more than the group conduct of the defendants." Categorization may in some situations give adequate notice. In this case, however, the category is excessively broad. While some of the individual defendants were officers and directors of Corco before the completion of the tender offer, others did not take such positions until afterwards. During the relevant time period, Tesoro went from a mere stockholder in Corco to controlling stockholder. DH&S apparently was Corco's independent auditor throughout the course of this controversy. DH&S is not informed whether plaintiffs seek to hold it liable for all alleged misstatements and omissions or only for a few. Although the so-called "Tesoro defendants" know that they are not to be held responsible for the initial issuance of several pretakeover statements, they do not know if they are charged with ratifying those statements; nor are they told whether they are to be held liable for the issuance of all other statements. Categorization of the defendants may indeed be proper in this case, but the categories must be narrowed. The relationship of each defendant or category of defendants to ·each statement and his specific responsibility therefore should be clearly delineated.

 The allegations in ¶ 21 of a conspiracy "between some of the defendants" and of directly or indirectly assisting, aiding, and abetting are also too vague to withstand Rule 9(b) scrutiny. If plaintiffs are in fact alleging a specific scheme or plan to

violate the securities laws, then they must describe it with sufficient particularity to give each participant ("some of the defendants" will not do) fair notice of the charges against it. (See discussion of Count II, *infra*.) These requirements are not too onerous. Although plaintiff may not be in a position to delineate the precise role of the defendants, once the core conspiracy is set out in sufficient detail, there remains the obligation to inform each defendant of what he did to join the conspiracy. Moreover, if the conspiracy of which plaintiffs complain is a scheme to manipulate the securities market, which it appears to be, the 9(b) requirement of specificity will facilitate the review required by *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1976).

■ Paragraphs 21 and 27 are dismissed with leave to amend.

b. *Omissions and Misrepresentations:* Plaintiffs contend that in setting forth the omissions and misrepresentations on which they relied, they need only categorize the matters omitted or misrepresented and the relevant documents. We reiterate that categorization satisfies Rule 9(b) only to the extent that defendants have sufficient notice of the charges against them to enable them to respond and prepare a defense. In a complex securities case covering a period of years during which time the parties have issued a number of documents and statements, Rule 9(b) requires that the defendants be informed of the facts which were omitted, the statements or documents from which they were omitted (at least by specific category), and why as a result of the omissions the statements made are believed to be misleading. See Denny v. Barber, supra, at 469; Richardson v. White, Weld & Co., supra, at 93,611; Rich v. Touche Ross & Co., 68 F.R.D. 243, 247 (S.D.N.Y. 1975); Gross v. Diversified Mortgage Investors, supra, at 1087; see Felton v. Walston & Co., Inc., supra. Similarly, plaintiffs alleging that a certain statement was false or misleading must state the substance of the statement, the report or document in which the statement appeared, and in what respect it was misleading. See Denny v. Barber, supra, at 469; Rich v. Touche Ross & Co., supra, at 246; Gross v. Diversified Mortgage Investors, supra, at 1087.[15]

(i) *Omissions:* Standing alone, the list of omissions in § 23 is less than specific in its notice of the facts plaintiffs believe should have been disclosed. This court has many indications, however, that defendants know exactly the matters the complaints address; in this factual milieu most of ¶ 23 is sufficient to inform.

Paragraph 23(a) alleges that plaintiffs were committed to unidentified purchase and supply contracts with unspecified third parties which resulted in $60,000,000 in losses in 1975 through 1977. At all times relevant to the present case, the defendant Corco was the principal refiner of petrochemical products in Puerto Rico. The contracts to which such a corporation was a party may have been numerous. If this court only considered the bare bones of ¶ 23(a), we would have to find it insufficient under Rule 9(b) for failing to specify the relevant contracts.[16]

As observed, we measure the sufficiency of the allegation in the actual factual frame

---

**15.** We do not find that the Fifth Circuit cases compel a different standard for this action. In *Bobby Jones Garden Apartments, Inc. v. Suleski*, 391 F.2d 172 (5th Cir. 1968), the complaint apparently only alleged that the manufacturer said the heaters would heat, and that they did not heat. *Id.* at 178, n. 18. In a simple fraud case not involving multiple parties or numerous alleged misstatements or omissions, and not extending over a long period of time, the requirements for particularity are not as great as those presented in the instant case. The *Suleski* complaint was adequate to give the defendant notice of a single, isolated incident.

**16.** *Denny v. Barber, supra,* would suggest such a result. In that case, plaintiff complained that defendants had failed to disclose that certain loans made by the defendant bank were "risky." Dismissing the complaint, the court pointed out that plaintiff had not specified "what loans, at what times, and in what amounts were 'risky' . . . and there is not even an indication of the date at which defendants knew the investments had become so unacceptably 'risky' that disclosure was required." 576 F.2d at 469–70.

before the court. In doing so, we do not put on judicial blinders and look only at the complaint. Other pleadings and events may reveal how much the words of the complaint communicate. Defendants' brief in support of their motion, the accompanying documents and their answer to the original complaint all demonstrate that defendants are well aware of the contracts to which ¶ 23(a) refers. In the Tesoro defendants' brief in opposition to this motion, they launch a strong attack on plaintiffs' pleadings and complain heartily of 9(b) deficiencies. They then move for summary judgment on the ground that the drawbacks of the contracts—contracts which they supposedly could not identify from plaintiffs' vague complaints—were fully revealed. They refer the court to several documents which address these "unknown contracts" and identify them by name. Additionally, the complaint refers to two documents which name these mysterious contracts. Both the April 23, 1975 Notice to Corco Shareholders and defendant Keith's much-disputed letter discuss the fixed-price contracts with the Puerto Rico Water Resources Authority, W. R. Grace and Co., and PPG Industries. Plaintiffs have adequately informed defendants of these documents. Finally, before the *Jaroslawicz* case was transferred to this court, the defendants managed to answer the original complaint. *See Morse v. Peat, Marwick, Mitchell & Co.,* supra, at 99,493. This is not to say that this fact alone means the pleading gave defendants sufficient notice. It is to say that when considered with the other matters indicating defendants' awareness of the precise contracts in question, their response to the first complaint contributes to this court's conclusion that the requirements of Rule 9(b) are here met. A requirement that plaintiffs specify in greater detail the contracts in question would only delay this proceeding and would be of no real notice benefit to the Tesoro defendants.

Paragraph 23(b) and (c) claim that Corco was unable to repay certain unspecified loans in excess of $150,000,000, and that unidentified banks granted Corco undescribed waivers. Again, defendants in their brief in support of their motion for summary judgment refer this court to several publications which discuss Corco's loans and bank waivers. In the amended complaints, ¶ 25(f), plaintiffs refer to the Summary Report of July 15, 1975. In that report, Corco discusses negotiations "with the bank group which holds our $150 million loan pursuant to a credit agreement between Corco and nine banks (the "Banks"), dated September 15, 1974, amended on March 27, 1975, September 30, 1976, and November 5, 1975 . . . .." In light of these facts, defendants cannot justifiably claim that they do not know which loans or waivers are involved.

Paragraphs 23(c) and (d) mention "Corco's desperate financial plight" and the "known financial difficulties of Corco." In order to defend against the charges in (c) and (d), the defendants must have notice of just what those financial difficulties were. When read against the allegations of ¶ 23(a) and (b) concerning the contracts and loans, however, this otherwise vague phrase is clarified.

In ¶ 23(d), plaintiffs claim defendants did not reveal that "the publicly anticipated merger between Tesoro and Corco would not occur . . . .." Defendants contend that this allegation does not identify when or how it became apparent that the merger would not occur, and thus does not satisfy Rule 9(b). Defendants' points are not well taken. First, plaintiffs allege in ¶ 24 that by November 1, 1975, all defendants had knowledge of all omissions. Second, Rule 9(b) certainly does not require a plaintiff to guess how a business decision "became apparent" to a defendant—a matter normally within the defendants' exclusive knowledge.

Paragraph 23(e) alleges "that the periodic presentation of Corco's financial condition assumed Corco's ability to continue to exist on a going concern basis throughout the Class Period, during which time the assumption was known to be unreliable." Plaintiffs' counsel clarified in oral argument which reports this claim addresses and precisely what information they allegedly lacked. Defendants thus have adequate no-

tice. Oral statements do not supply an omission of pleadings; but when the requirement is fair notice and defendants do know, despite a cryptic or vague pleading, this is enough.

■ In ¶ 23(f), plaintiffs claim that the defendants violated Rule 10b–5 by failing to reveal that they were conspiring to conceal from the public the above five omissions.[17] This allegation cannot withstand scrutiny under Rule 9(b). Conclusory claims of a conspiracy, without more, are insufficient. Its core must be alleged. *See Segal v. Gordon, supra,* at 608. *Cf. Santa Fe Industries, Inc. v. Green, supra.*

(ii) *Misrepresentations: The Documents and Their Contents*: Defendants contend that plaintiffs have not precisely pointed to how the various omissions render any of the statements set forth in ¶ 25 misleading. While the nexus is not as clear as it might be, for most of the subsections in ¶ 25, it nonetheless exists. Paragraphs 25(a), (b), (f), (j), (l), and (q) all contain statements which arguably were rendered misleading by the omission alleged in ¶ 23(a)—the improvident contracts. Similarly, the statements in ¶ 25(c), (d), (e), (g), (h), (l), (n), and (p) could have been misleading as a result of defendants' failure to reveal that the merger was not going to occur, as alleged in ¶ 23(d).

Several of the subsections of ¶ 25, however, notably (i), (k), (m), and (o) list only a document but do not refer to a misrepresentation which the document supposedly contained. Plaintiffs' allegation that the omissions of ¶ 23 should have been included in the various documents does not save these barren subsections, for plaintiffs do not hint how any of the omissions could have rendered the documents misleading. These

subsections must be clarified by amendment. Accordingly, they are dismissed without prejudice to their explication by amendment filed within ten (10) days.[18]

### 2. *Count II.*

■ Count II alleges that as a part of a larger conspiracy to offer Corco stock to the public at a price higher than that for which the stock otherwise would have sold, "some or all of the defendants" made the misstatements and omissions alleged in Count I. Defendants contend that Count II's allegation of "conspiracy" is so vague as to offend Rule 9(b). We recognize that plaintiffs in Count II are actually complaining of manipulative conduct which violates § 10(b) of the Securities Exchange Act and Rule 10b–5. Manipulation, however, is "virtually a term of art when used in connection with the securities markets." *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1976). Plaintiffs have not alleged sufficient facts to allow a determination of whether the conduct of which they complain is manipulative within the meaning of § 10(b); *a fortiori* the allegation is insufficient under 9(b). Furthermore, because it incorporates by reference Count I, Count II necessarily suffers from the same Rule 9(b) maladies as the first count does. Count II must be explicated by amendment.

### 3. *DH&S.*

Because Count III names only DH&S as defendant and because DH&S raises certain matters in its brief which the Tesoro defendants do not address, DH&S will be considered separately. Defendant DH&S contends that plaintiffs failed to specify in

---

17. We raise without deciding the issue whether this allegation states a claim on which relief can be granted. *See Golub v. PPD Corp.,* 576 F.2d 759 (8th Cir. 1978); *Goldberger v. Baker,* 442 F.Supp. 659 (S.D.N.Y.1977).

18. Defendants point out that ¶ 24 charges all defendants with knowledge as of November 1, 1975. They argue that if before November 1, 1975, they did not know the various documents were misleading, then they did not act with

scienter. They contend that for this reason, ¶ 25(a)–(h) should be dismissed for failure to state a claim. Those subsections all refer to documents which were released prior to November 1, 1975. In the amendment which this order requires, plaintiff will specify the liability they seek to impose on each defendant for each of the various misstatements and omissions. When plaintiffs so amend, the allegation of scienter in ¶ 24 will be adequate.

their complaints which financial statements were false and misleading, and that such vagueness is fatal under Rule 9(b). Count III is certainly not a model of clarity. Plaintiffs appear to challenge in ¶ 44 and ¶ 45 the accuracy of certified financial statements and opinions pertaining to the periods ending December 31, 1974 and December 31, 1975, including those opinions which DH&S rendered after the takeover to Tesoro and Hutton. This category of documents is sufficiently narrow to give DH&S adequate notice to prepare its case.

Much of the Rule 9(b) dispute between DH&S and plaintiffs springs from the fact that the parties do not agree on the type of conduct for which an accountant can be liable under Rule 10b–5. Defendant contends that plaintiffs must allege and prove the particular aspects of each financial statement which are accurate, the exact amounts by which they are incorrect and the way in which the accountants failed to conduct their audit in accordance with generally accepted accounting principles. Defendants rely for authority on *Felton v. Walston and Co., Inc., supra,* at 581; *Jacobsen v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 523 (S.D.N.Y.1977); and *Gross v. Diversified Mortgage Investors, supra,* at 1089–90. Plaintiffs state that defendant's proposed standard may be appropriate for some cases, but not for all.

We find persuasive plaintiffs' contention that an auditor, acting with scienter, who prepares or certifies a financial statement which states amounts and numbers accurately but nonetheless conveys an inaccurate overall picture of the company's financial condition is liable for his misleading certification. "Compliance with generally accepted accounting principles is not necessarily sufficient for an accountant to discharge his public obligation. Fair presentation is the touchstone for determining the adequacy of disclosure in financial statements. While adherence to generally accepted accounting principles is a tool to help achieve that end, it is not necessarily a guarantee of fairness." *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378

F.Supp. 112, 122 (S.D.N.Y.1974), *aff'd,* 540 F.2d 27 (2d Cir. 1976), *quoting* Sonde, 68 N.W.U.L.Rev. 4 (1968). Thus, even though the actual figures in any financial statements may be accurate, the statements as a whole may inaccurately present the company's financial status and thereby fail to "perform the function of enlightenment." *Id.* at 122.

The crucial question for purposes of this motion, then, is whether plaintiffs in Count III sufficiently apprise DH&S of the way in which its financial statements and opinions were allegedly misleading. Plaintiffs allege that DH&S knew or should have known "the truth of the financial condition of Corco"; that DH&S "lent its name as accountants and auditors in support of the defendants' portrayal of the financial conditions and prospects of Corco"; that DH&S certified without qualification its financial statements; and that DH&S "issued, reissued or consented to the use of its opinions rendered on Corco financial statements for the use of defendant Tesoro and its auditors." Count III also claims that at all times during the class period, DH&S "failed to disclose to the public or take steps otherwise to assure disclosure to the public of the true financial condition and prospects of Corco."

Count III incorporates by reference most of Counts I and II. When viewed as a part of the larger complaint, Count III's conclusory language assumes meaning. "The truth of the financial condition of Corco" refers to the omissions in ¶ 23, specifically, the contracts, loans, bank waivers, and the cancellation of the Tesoro merger. The allegation that DH&S failed to disclose to the public "the true financial condition and prospects of Corco" implies that the financial statements and opinions were misleading in that they did not reveal this "true condition." Paragraph 25(j), which is the sole reference in Count I to one of the auditor's opinions, adds more substance to Count III. It states that in a particular *opinion which was part of the 1975 Annual Report* "qualifications from prior opinions" were removed and Corco's "disappointing

financial results" were attributed to "transitory reasons extrinsic to the company and other than the contracts." Count III thus satisfies Rule 9(b).

### C. 12(b)(6) Motions—Causation :

Defendants contend that plaintiffs' complaint must also be dismissed because it does not adequately allege reliance. Plaintiffs' allegations are sufficient.

■ Causation is a necessary element in a private action for damages under Rule 10b–5. If plaintiffs seek to impose liability for misstatements, they must prove that the misrepresentation was a substantial factor in their securities activities. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27 (2d Cir. 1976). If, however, they accuse the defendant of omissions, they need only establish that the omissions were material. The test for materiality is whether a reasonable man in determining his course of action would attach importance to the alleged omission. *TSC Industries, Inc. v. Northway, supra* 426 U.S. at 449, 96 S.Ct. 2126. . A finding that information was material allows a reasonable inference of reliance. *Titan Group, Inc. v. Faggen*, 513 F.2d 234 (2d Cir. 1975).

Plaintiffs repeatedly allege reliance and materiality. In ¶ 3, plaintiffs claim that they purchased stock "relying upon the integrity of the information in the market place relating to the finances and prospects of Corco as caused to be disseminated by defendants." Similarly in ¶ 35, plaintiffs allege that "by reason of defendants' aforesaid omissions and misleading statements, plaintiff and the Class were induced to purchase and did purchase shares of Corco . . . ." Paragraph 38 in Count II makes an almost identical allegation. By stating that plaintiffs "were induced to purchase" "by reason of" the misstatements, and that they purchased "relying upon" the available information, they adequately allege reliance. Similarly, in claiming that the omissions were material in ¶ 22, 23, and 26, plaintiffs sufficiently allege causation. The fact that plaintiffs do not use the precise language of the cases does not mandate

dismissal of their claims, for they have alleged a causal connection between their purchases and the misstatements and omissions.

■ In Count III, plaintiffs make no new claims of causation. Although they do not incorporate ¶ 36 (which alleges causation in Count I), they do incorporate ¶¶ 3, 22, 23, 26, and 38. DH&S contends that even if causation is properly alleged for the rest of Count III, it is not correctly claimed for ¶ 45 which must be dismissed. It cites as authority *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139 (3d Cir. 1973). Paragraph 45 alleges that the accountants "issued, reissued and consented to the use of its opinions rendered on Corco financial statements for the use of defendant Tesoro and its auditors." The *Landy* case does not justify dismissal of this claim. In that case, plaintiffs alleged that an accountant was liable for misleading information in financial statements which the accountant had issued to the bank's board of directors. The Third Circuit held that summary judgment for defendant on this complaint was proper. The court reasoned that nothing in the affidavits or testimony suggested fact issues as to whether the accountant knew or reasonably expected the report to be exhibited to purchasers or as to whether the accountant's reports actually were used in the bank's public Annual Report. *See Wessel v. Buhler*, 437 F.2d 279 (9th Cir. 1971) [in which the Ninth Circuit upheld a directed verdict for accountant-defendant because the financial statements it prepared were not publicly disseminated.] In the instant case, these issues are matters to be resolved by summary judgment or at trial, but not on a motion to dismiss. The complaint sufficiently alleges causation and thus implies that the financials and opinions which supposedly were supplied to Tesoro and its auditors were also disseminated to the public.

### D. Motion for Summary Judgment :

■ The Tesoro defendants move the court for summary judgment on the grounds that the omissions alleged in

¶ 23(a)–(d) were in fact disclosed, leaving no genuine issue of material fact. Defendants' motion is denied.

Defendants contend that adverse information concerning fixed-price contracts to supply refined petroleum products to Corco's joint ventures was revealed in Corco's form 10–K report filed March 30, 1976, for the fiscal year ending December 31, 1975. They are correct. The 10–K clearly states that these contracts required Corco to sell "at prices significantly below cost." Defendants fail to point out that this same information was apparently not revealed in the company's Annual Report which was made public in 1976. (The annual report did refer to the 10–K, however). This court is unwilling to decide on a motion for summary judgment that the 10–K disclosure alone was adequate. Plaintiffs contend and defendants do not deny that in numerous documents defendants did not blame Corco's losses on the contracts but on transient economic factors. Furthermore, often a crucial issue in 10b–5 litigation is whether a disclosure was timely.[19] The fact that in the 1975 10–K defendants may have revealed information about the contracts does not mean that the disclosure was sufficiently prompt.

Second, defendants argue that the omissions alleged in ¶ 23(b) and (c) that Corco was unable to repay certain loans and that the bank waivers were due to Corco's "desperate financial plight" were actually disclosed. Keith's report to the shareholders, July 15, 1975, states only that the company has "entered into negotiations" to obtain certain modifications of the loan agreement, but does not address the bank's requirement that Corco give substantial security or give reasons for the "modifications." The 1975 Annual Report made public on March 20, 1976, mentions the waivers and the mortgages, but does not attribute them to any particular factor. The 1975

10–K filed March 30, 1976 is more specific. Defendants stated unequivocally that as a result of Corco's losses and the increase in Corco's inventories and accounts receivable, Corco had to obtain bank waivers and to give in return considerable security. The form 8–K report for June, 1976, filed July 9, 1976, describes in some detail the further amendments to Corco's Revolving Credit Agreement with the banks. Finally, Corco's quarterly report to the shareholders for the period ending September 30, 1976, filed December 6, 1976, gives a somewhat more cursory outline of the bank waivers. These disclosures were not insubstantial and appear to be in defendants' favor. The date the Tesoro defendants obtained control of Corco is disputed, however, and may have been as early as July, 1975. This court cannot decide that no fact issues exist as to the timeliness and completeness of defendants' disclosures.

Finally, this court rejects defendants contentions that the decision to call off the merger was, as a matter of law, adequately revealed. In April, 1976, after the Class Period began, Corco stated that "no agreement has been reached as to the [merger's] feasibility." On October 22, 1976, well into the Class Period, and after plaintiff Jaroslawicz purchased, Corco announced that merger discussions were "deferred." Whether these revelations were sufficiently prompt or complete are fact questions that cannot be resolved at this stage.

## IV.

## JOSEPH

### A. *Motion to Intervene:*

This action was commenced by plaintiff Seymour Joseph on August 14, 1977 as a class action under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, on behalf of all

---

**19.** This situation is distinguishable from those of the defendants in *Bouchard*, in that case the defendants do not have a relationship with the Dusard plaintiffs which generates a duty to correct previous misstatements of others. Thus their possession and nondisclosure of material facts could not render them liable under Section 10b 5. In this case, there is no question about defendants' duty to inform. The timeliness of their disclosures therefore is crucial.

purchasers of Tesoro securities between November, 1975 and June 7, 1977. The gravamen of Joseph's claim is that the Tesoro defendants knowingly concealed adverse information about Corco's financial condition and, when the necessity to write down the value of Tesoro's equity investment in Corco became apparent, they failed promptly to do so. Joseph does not assert a claim under section 11; nor could he, since he did not purchase Tesoro stock pursuant to a registration statement. S. Richard Stern now moves to intervene as an additional plaintiff in the existing 10b–5 claim and as a representative of a "subclass" of plaintiffs asserting a claim under section 11. Stern's section 11 complaint alleges that a registration statement and prospectus filed in December, 1975, which is not mentioned in Joseph's complaint, contained alleged misstatements and omissions and that Stern bought Tesoro preferred stock pursuant to the December, 1975 registration statement and prospectus.

The issues which this motion presents are twofold. First, may Stern intervene in the existing 10b–5 class. Second, if so, may he assert a claim under Section 11.

### 1. Intervention.

Rule 24(b)(2) Fed.R.Civ.P. requires that the intervenor's claim or defense and the main action have a common question of law or fact. Here, Joseph and Stern assert identical 10b–5 claims. The court must consider in exercising its discretion under Rule 24(b) whether, given the status and nature of the litigation, intervention will cause delay and otherwise prejudice the rights of the parties. *Romasanta v. United Airlines, Inc.*, 537 F.2d 915 (7th Cir.), 432 U.S. 385, 97 S.Ct. 2464, 52 L.Ed.2d 423 (1976). This case is still in its preliminary stages. At this early stage in the proceeding, any delay will not be great and is outweighed by the fact that it is in the interest of the class members to grant the intervention. This court has not yet determined whether Joseph's representative (Joseph himself is now deceased) is an adequate class representative. Thus, interven-

tion at this stage is appropriate in order to protect the interests of the class from defenses or objections applying solely to the single named representative. Moreover, Stern may supply an additional dimension to the 10b–5 class representation because he purchased convertible preferred stock whereas Joseph purchased common stock.

Defendants, contending that Stern's motion is both redundant and wasteful, cite numerous decisions denying leave to intervene. One of the cases cited, *Gabriel v. Standard Fruit and Steamship Co.*, 448 F.2d 724 (5th Cir. 1971) is inapposite. In that case, at the time of the proposed intervention of 113 additional plaintiffs, there were 36 named plaintiffs representing the class. Joseph, however, is the only named class representative. *Fox v. Glickman*, 355 F.2d 161 (2d Cir. 1965), *cert. denied* 384 U.S. 960, 86 S.Ct. 1585, 16 L.Ed.2d 672 (1966) was in a considerably different procedural posture than the instant action; in that case, at the time of the proposed intervention, the parties had completed all pretrial discovery. Because it is in the interest of the class, and because the delay will be insignificant, Stern's motion to intervene as a representative of the 10b–5 class is granted.

### 2. Limitations

Defendants contend that Stern's section 11 claim is barred by the statute of limitations. Section 13 sets the limitations period and requires that an action be commenced:

1. Within "one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence"; and

2. Within three years after the time the security was "bona fide offered to the public."

Stern has moved to intervene within three years after the preferred stock he purchased was first offered to the public. The issue is whether Stern satisfies the one year requirement.

Stern first contends that as intervening plaintiff, he may amend his com-

plaint under Rule 15(c), Fed.R.Civ.P., to assert a new claim even though that new claim might be time barred if asserted in a separate suit. He argues that the pendency of the 10b–5 class action tolls the statute of limitation for his section 11 claim. Stern's theory runs counter to both the purposes of the statute of limitations and the law established in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) and *Johnson v. REA, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

Statutes of limitations implement a policy of repose. Such statutes are "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded and witnesses have disappeared. The theory is that even if one has a just claim, it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944).

The Supreme Court in *American Pipe* evaluated the purposes of Rule 23, Fed.R. Civ.P. in light of the policies behind limitations statutes. It reconciled the policy of repose of the limitations statutes and the unitizing force of Rule 23 by holding that the pendency of a class action tolls the statute of limitations for members of the putative class. In that case, the State of Utah, representing state and local agencies and other western states, timely filed an antitrust action against petitioner. When the trial court refused to certify the class, members of the original class moved to intervene. Even though defendants contended the statute of limitations had expired, the Supreme Court permitted the intervention. In holding that the pending class action tolled the statute for the putative class members, the Court emphasized that the pending class claim had effectively notified the defendant of the substantial claim against him and thus served the policies of the statute of limitations. The

Court reasoned that a contrary holding would mean that until the class was certified, class members could only preserve their claims by filing additional suits or motions to intervene. Such multiplicity of activity would defeat the purposes of Rule 23, Fed.R.Civ.P.

In *Johnson v. REA, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the Supreme Court added to the understanding of the limits of the *American Pipe* holding. The Court emphasized that a pending action only has a tolling effect for later filings which assert" exactly the same cause of action" as the original claim. *Id.* at 467, 95 S.Ct. at 1723. The Court's application of this test emphasized its narrowness. Justice Blackmun held that the pendency of Title VII proceedings did not toll the statute of limitations for the assertion of an additional claim under 42 U.S.C. § 1981 by the same plaintiff. The court, in prohibiting the § 1981 claim, reasoned that although both statutes afforded causes of action for discrimination, there were differences in their coverage, remedies, and the assistance they afforded parties. Justice Blackmun was apparently unswayed by the fact that both of the plaintiff's claims were based on the same set of factual circumstances. Johnson alleged that his employer had racially discriminated against him in seniority, job assignments, and firing. The Court stated, "Only where there is complete identity of the causes of action will the protections [against the running of the statute of limitations] necessarily exist." 421 U.S. at 468, n.14, 95 S.Ct. at 1724.

In light of *American Pipe, Johnson*, and the purposes of the statute of limitations, Stern's claim that the statute is tolled as to his section 11 claim is without merit. The claim does not constitute "exactly the same cause of action" as the 10b–5 claim. Indeed, there are significant differences. Under section 11, all material misrepresentations are actionable and defendants have the burden of proving that they acted with due diligence. 15 U.S.C. § 77k(b) (1971). Section 10(b) and Rule 10b–5, on the other hand, place the burden on the plaintiff to

show that defendants acted with scienter; mere negligence does not satisfy Rule 10b–5. Significantly, the factual bases of the two claims are different. Stern in his section 11 claim asserts that defendants made misstatements in the Registration Statement and prospectus filed in December, 1975. The 10b–5 claim makes no mention of this registration statement or prospectus. The pending 10b–5 claim thus fails to give satisfactory notice of Stern's claim and to permit assertion now of the section 11 claim would frustrate the purpose of the statute of limitations.

Stern's contention that under Rule 15(c), Fed.R.Civ.P., his amendment "relates back" to the date of the original pleading cannot stand. Rule 15(c) deprives a defendant of the benefit of the statute of limitations only as to the later assertion by amendment of claims arising out of the same "conduct, transaction or occurrence" as the original claim. Thus courts have allowed amendments to relate back which correct technical deficiencies, or expand or modify the facts alleged. *Cummings v. Greif Brothers Cooperage Co.*, 202 F.2d 824 (8th Cir. 1953); *see Kelcey v. Tankers Co.*, 217 F.2d 541 (2d Cir. 1954).

A crucial factor in determining whether the amendment refers to the same "conduct, transaction or occurrence" as, the original claim and thus relates back is whether the original claim put the defendant on notice of the matters asserted in the amendment. 6 C. Wright & A. Miller § 1497. Contrary to his assertion, Stern's proposed amendment does not merely present a different legal theory based on the same facts as the original complaint. Rather, as discussed above, Stern alleges new events not even mentioned in the original complaint. Furthermore, the difference in the legal base of the claims is marked. The difference means that defendants have had no notice of the shift in the burden of proof and the elimination of the scienter requirement which section 11 entails.

*American Pipe* and *Johnson* do not contemplate the use of Rule 15(c) which plaintiff here proposes. The Tenth Circuit so held in *Monarch Asphalt Salt Co., Inc. v. Wilshire Oil Company of Texas*, 511 F.2d 1073 (10th Cir. 1975). In that antitrust case, the district court granted class certification to a subclass of governmental bodies, but declined to certify the proposed subclass of private contractors. Shortly after the statute of limitations ran, several private contractors attempted to intervene in the pending suit by filing a motion to intervene and by having the plaintiff file a motion to amend his complaint and add the private contractors as additional plaintiffs. The court rejected the contractors' argument that their intervention should automatically relate back to the date on which the original action was filed and stated that the reasoning of *American Pipe* precluded such a result. 511 F.2d at 1079.[20] Similarly, a holding that a class member may intervene as plaintiff, then rely on Rule 15(c) to amend his complaint and assert an entirely new claim would undermine the logic and language of *Johnson*.

Defendants argue that because Stern failed to exercise reasonable diligence, he would have discovered his claim no later than May 31, 1977, more than one year before he moved to intervene, and that his section 11 action is thus barred. They also contend that the issue of due diligence may be resolved in this case as a matter of law. Stern asserts that the questions of his due diligence and of defendants' fraudulent concealment are ones of fact and at this stage cannot be resolved. Because we have granted Stern's motion to intervene, defendants' objection to his section 11 claim must be treated as a motion to dismiss. In ruling· on a motion to dismiss, the court must take as true all matters asserted in its complaint. Stern specifically alleges that

**20.** The Tenth Circuit was clearly correct. The plaintiffs were not members of the class and yet were trying to intervene in order to save their state claims. The court pointed out that if the Supreme Court had intended *American*

*Pipe* to sweep so broadly as to toll the statute for nonmembers as well as for members of the class, it would not have founded its reasoning on a careful analysis of the nature of a Rule 23 class.

he could not have known of the alleged wrongful acts of the defendants before August 19, 1977 (Proposed Complaint, ¶ 39). Notice on the motion to intervene was served August 3, 1978, within the one year statutory period. Because we must take plaintiff's allegation as true, we cannot find at this stage in the proceedings that Stern's section 11 claim is time-barred.