**SEATTLE–FIRST NATIONAL BANK, Plaintiff,**

v.

**James CARLSTEDT, et al., Defendants.**

Nos. CIV–83–2425–B to 83–2428–B, 83–2483–B to 83–2488–B, 83–2544–B to 83–2551–B, 83–2553–B to 83–2568–B and 83–2632–B.

United States District Court, W.D. Oklahoma.

April 25, 1984.

Opinion on Motion to Amend Counterclaim May 17, 1984.

Russell Mulinix, Oklahoma City, Okl., Cynthia Ford, Seattle, Wash., for plaintiff.

G. Rudy Hiersche, Jr., Oklahoma City, Okl., for defendants James Carlstedt, S. Lee Puckett Management Co. and S. Lee Puckett.

Larry D. Patton, Oklahoma City, Okl., James M. Shuler, Tampa, Fla., for all other defendants.

## OPINION

BOHANON, District Judge.

These cases originated with a series of complaints filed by the plaintiff, Seattle-First National Bank (hereinafter "Seattle-First"), in October, 1983 against the 35 individual defendants. Though the defendants reside in a variety of geographical locations, many of them in Florida, Seattle-First brought the actions in this district because it alone offered proper venue and jurisdiction, under the Oklahoma long arm statutes,[1] as to all of the defendants and because of the presence here of certain documents relevant to the cases. The basis of the complaint in each case was default by the defendant on a promissory note. The notes in question were originally executed and delivered to Penn Square Bank (hereinafter "Penn Square" or "PSB") in exchange for loans amounting to 75% of the purchase price of interests which the defendants acquired in the Onyx Private Drilling Program, Ltd.—the remaining 25% being supplied by the defendants out of their own resources.

Seattle-First alleges and the defendants do not deny that several weeks after the notes were executed Seattle-First purchased a contractual interest in the notes, known as a "participation" in the banking trade.[2] Penn Square was declared insol-

1. Okla.Stat.Tit. 12 §§ 1701.03, 1701.04 (1981).

2. Under the usual form of this type of agreement, Penn Square would remain the "lead

vent by the Comptroller of the Currency of the United States in July of 1982. Because Seattle-First held the participation, the Federal Deposit Insurance corporation (hereinafter "F.D.I.C."), as receiver for Penn Square, later assigned the notes to Seattle-First for collection.

After the cases were consolidated, the defendants, except S. Lee Puckett Management and S. Lee Puckett (hereinafter "Puckett")[3] and James Carlstedt (hereinafter "Carlstedt"), filed alternative motions to dismiss for improper venue or to transfer the cases to the Middle District of Florida where these same defendants had filed suit[4] against Seattle-First, Carlstedt, Puckett and others[5] alleging fraudulent violations of federal and state securities laws in connection with the same transactions involved in the present action. These motions were denied based upon a determination by this court that the record did not disclose that the Florida court could exercise *in personam* jurisdiction over all of the defendants in this action and a determination that neither factors of judicial economy nor convenience to the parties favored the Florida forum. Subsequently all defendants, including Puckett and Carlstedt,

have answered Seattle-First's complaint in this court and have filed counterclaims which parrot in substantial detail[6] the complaint in the Florida action.[7]

Before the court now is Seattle-First's motion to dismiss the counterclaims for failure to comply with Fed.R.Civ.P. 9(b). The rule in question states that:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The reasons courts have found for this limitation of the liberal pleading requirements stated generally in Fed.R.Civ.P. 8(a)[8] were summarized by the court in *In Re Commonwealth Oil/Tesoro Petroleum Corporation Securities Litigation*[9] as follows:

> The rule has three purposes. First, it ensures that the allegations are specific enough to inform a defendant of the act of which the plaintiff complains and to enable him to prepare an effective response and defense. *Felton v. Walston*

---

bank" on the notes, empowered and obliged to handle the business of collecting on the notes even though it might have retained only a minority interest in them. *Cf. Chase Manhattan Bank, N.A. v. F.D.I.C.*, 554 F.Supp. 251 (W.D. Okla.1983).

3. Actually, the case involving Puckett was not consolidated with the others until several months after the original order of consolidation. This fact, however, will not be significant for the purposes of this memorandum.

4. No. 83–1085–T–15, Hastings, et al. v. Seattle-First National Bank, et al.

5. The defendants listed on the original Florida complaint are Seattle-First; Ramco Exploration, Inc., f/k/a Onyx Resources, Inc.; Leroy Belcher; Carlstedt & Associates, Inc.; S. Lee Puckett, Inc.; and Onyx Private Drilling Program, Ltd. 1981. The amended complaint filed in the Florida action on February 2, 1984 adds the name of James Carlstedt and deletes Onyx Private Drilling Program.

6. The counterclaims filed by Carlstedt and Puckett necessarily differ from that filed by the other defendants and from the Florida com-

plaint since Carlstedt is named as a counter-defendant in the counterclaim filed by the majority of defendants, and both Carlstedt and Puckett have been named as co-defendants with Seattle-First in the Florida action, allegedly because they participated to some extent in the promotion and sale of the securities for which the present loans provided financing. However, both Carlstedt and Puckett also participated as purchasers, signed Penn Square notes and are seeking counterclaim relief against Seattle-First under theories identical to those plead by the other defendants.

7. The defendants other than Carlstedt and Puckett also had the temerity to file again a motion to transfer. Once a court has ruled on a motion, a party who makes a motion on the same grounds importunes. Nothing further needs be said.

8. "A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim shall contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, ..."

9. 467 F.Supp. 227 (W.D.Tex.1979).

& Co., Inc., supra [508 F.2d 577 (2nd Cir.1974)]; Dudley v. Southeastern Factor & Finance Co., 446 F.2d 303, 308, n. 6 (5th Cir.1971); Richardson v. White, Weld & Co. [Current] Fed.Sec.L.Rep. (C.C.H.) ¶ 96,448 (S.D.N.Y.1978). Second, it eliminates those complaints filed "as a pretext for discovery of unknown wrongs." Gross v. Diversified Mortgage Investors, 431 F.Supp. 1080, 1087 (S.D.N.Y.1977). The Second Circuit explained: "A complaint alleging fraud should be filed only after a wrong is reasonably believed to have occurred; it should seek to redress a wrong, not to find one." Segal v. Gordon, 467 F.2d 602, 607–08 (2d Cir.1972). A plaintiff in a non-9(b) suit can sue now and discover later what his claim is, but a Rule 9(b) claimant must know what his claim is when he files it. Third, Rule 9(b) seeks to protect defendants from unfounded charges of wrongdoing which injure their reputation and goodwill. Id. at 607, 5 C. Wright & Miller, Federal Practice & Procedure § 1296.[10]

Relevant to the second purpose outlined by the Commonwealth Oil/Tesoro Petroleum court is the Supreme Court's acknowledgement in Blue Chip Stamps v. Manor Drug Stores[11] that litigation involving claims of violations of federal securities laws "presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." Writing for the Court, Justice Rehnquist noted, in an often quoted[12] passage that

in the field of federal securities laws governing disclosure of information even a complaint which may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at

trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment.[13]

Apart from their general nuisance value, these so-called "strike" suits may provide an opportunity for "fishing" or just plain harassment via discovery:

The potential for possible abuse of the liberal discovery provisions of the Federal Rules of Civil Procedure may likewise exist in this type of case to a greater extent than they do in other litigation. The prospect of extensive deposition of the defendant's officers and associates and the concomitant opportunity for extensive discovery of business documents, is a common occurrence in this and similar types of litigation. To the extent that this process eventually produces relevant evidence which is useful in determining the merits of the claims asserted by the parties, it bears the imprimatur of those Rules and of the many cases liberally interpreting them. But to the extent that it permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit.[14]

In the present case, Seattle-First filed two affidavits in connection with an earlier memorandum in opposition to defendants' repetitive motion to transfer. One affidavit, by Richard M. Monroe, an employee of the holding company that now owns Seattle-First, was signed on March 5, 1984. The other, by Cynthia Ford, an attorney representing Seattle-First in both this and the Florida action, was signed March 2,

---

10. Id at 250.

11. 421 U.S. 723, 739, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1974).

12. See e.g. Decker v. Massey-Ferguson, Ltd., 681 F.2d 111 (2nd Cir.1982); Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of Culinary Workers, 542 F.2d 1076 (9th

Cir.1976); Shamrock Associates v. Moraga Corp., 557 F.Supp. 198 (D.C.Del.1983); Franke v. Midwestern Oklahoma Development Authority, 428 F.Supp. 719 (W.D.Okla.1976).

13. 421 U.S. at 740, 95 S.Ct. at 1927.

14. Id. at 741, 95 S.Ct. at 1928.

1984. Both were filed with this court on March 7, 1984. The allegations in those affidavits have never been denied by the defendants. and under the Local Rules of the Court are now deemed to be true.[15]

Mr. Monroe's reads as follows:

1. I am an employee of Seafirst America Corporation. During the summer of 1983 I worked in the Oklahoma City office and had primary responsibility for the loans involved in this action.

2. During July 1983 I was in contact with many of the borrowers and their attorneys regarding payments due on the notes and the status of the Onyx Limited Partnership.

3. I was informed that those investors and their counsel with whom I was dealing were part of a committee representing a majority of the limited partners of the Onyx program.

4. On July 29, 1983, I sent letters to the defendants and other borrowers informing them that their notes were in default and demanding full payment of all principal and interest due on the notes. I also informed the borrowers that:

> [I]n accordance with the understanding between Seattle-First and a committee purportedly representing a majority of the limited partners of the Onyx program, Seattle-First will not initiate a lawsuit against you or foreclose on the collateral that is security for the note for sixty days from the date of this letter. Upon expiration of the sixty-day period, Seattle-First will refer this matter to its attorneys to initiate collection proceedings if payment in full has not been received....

Seattle-First agreed to defer the filing of lawsuits against the borrowers in a good faith effort to avoid unnecessary litigation.

5. At the end of September 1983 I instructed counsel for the bank to begin drafting and filing complaints against those borrowers who continued in default upon their notes.

6. *I did not learn that the Onyx investors had filed suit against Seattle-First National Bank in the United States District Court for the Middle District of Florida until mid October 1983*, when the bank was served with process in the case of *Hastings, et al. v. Seattle-First, et al.*, Case No. 83–1085–CIV–T–15 [filed August 26, 1983] (emphasis added).

Ms. Ford made the following statements, among others:

10. Seattle-First National Bank first contacted me regarding a potential lawsuit against the borrowers in July 1983 but I was later informed that, pursuant to an agreement with a committee of the borrowers, no lawsuits would be filed until sixty days from July 29, 1983. In late September 1983 I was instructed to commence proceedings against the borrowers in default.

11. After I had drafted the complaints against each of the defendants in this action, I wrote to them, again advising them that Seattle-First intended to file lawsuits against each of them unless payment was promptly made. I did so in a good faith effort to avoid unnecessary litigation.

12. Prior to the filing of the lawsuits, I was contacted on several occasions by Mr. Shuler, who had been advised of the bank's intent to commence litigation against the defaulting borrowers. *In each conversation he requested that the bank delay the initiation of the actions in an effort to resolve the situation without resort to the courts.* His request was granted several times, until it became apparent that a quick resolution was unlikely.

\*  \*  \*  \*  \*  \*

14. Seattle-First was served with the original complaint in the Florida action

---

**15.** "Any motion, application or objection which is not opposed within fifteen (15) days ... shall be deemed confessed." Rules of the United States Court for the Western District of Oklahoma 14(a).

on October 12, 1983, and received by my office on October 17, 1983. The summons was dated October 6, 1983, ... (emphasis added).

Though this evidence is not conclusive, it is sufficient to raise at least a belief that the Florida defendants in this action are guilty of bad faith in their filing of the Florida action and consequently of the substantially identical counterclaim in this case. The "Mr. Shuler" mentioned by Ms. Ford is the same attorney who filed the Florida complaint for defendants on August 26, 1983—within the sixty day period granted by Seattle-First in a good faith effort to avoid litigation pursuant to an understanding with at least some of these defendants, and long before he asked Ms. Ford to delay the bank's litigation and attempt to settle the matter "without resort to the courts." Such flagrant abuse of another party's good intentions may well be grounds for disciplinary action against the attorney perpetrating it, and at the very least calls for strict scrutiny of the pleading involved to determine whether it meets the standard imposed by Rule 9(b).

The counterclaim filed by the defendants/counter-plaintiffs (defendants) is far from the "simple, concise and direct" pleading required by Fed.R.Civ.P. 8(e). To borrow an apt phrase from the second circuit, "The [counterclaim] is an 'everything but the kitchen sink' type of pleading which would give [defendants'] attorneys carte blanche in the area of liberal federal discovery." [16] In order to abbreviate the tedious process of distilling the content of all this verbiage, the court's analysis of the counterclaim will begin with the defendants' Memorandum in Opposition to Plaintiff's Motion to Dismiss (at pages 10 and 11) where they purport to say what the counterclaim says:

The role played by SeaFirst and the duty that followed is set forth with clarity in the Counterclaim. It used PSB as a broker or agent to locate private oil and gas ventures to finance. Paragraph 11. It is liable for its agent's misconduct occur-

ring within the scope of that agency under the principle of *respondent* [sic] *superior.*

It must be emphasized that this passage in the memorandum contains the first reference by defendants to the doctrine of *respondeat superior.* The counterclaim never mentions the doctrine by name. Prior to this memorandum there was at least no *explicit* indication that that theory was intended by the counterclaim.

Paragraph 11 of the counterclaim, referred to in the passage quoted above, contains the following description of the "agency" relationship alleged:

... PSB's role became that of a broker for financial institutions that were eager to underwrite private oil and gas programs.... at the time of the Onyx promotion, PSB was heavily indebted to and dependent upon a number of banking institutions, including SeaFirst; many of the oil and gas programs which PSB brokered and promoted in this fashion, such as Onyx, had no viable prospect of providing any return to the investors; many of these programs were promoted and structured *to provide PSB's customer-promoters* with a cash flow that would enable *the customers*, such as Well Services and Ramco here [sic] to avoid default on PSB obligations. Thus, PSB (along with its customers) was able to remain in business, if not remain solvent, by simply brokering oil and gas and other ventures to lenders such as Sea First *to whom PSB was indebted.* The failure of PSB threatened SeaFirst with insolvency and resulted in its takeover by the Bank of America. (emphasis added).

To call this "pleading with clarity an agency relationship between Penn Square and Seattle-First" is something of a travesty. It is not at all clear from the facts alleged just who was agent to whom, or if there was in truth an agency relationship. The defendants seem to be saying that Penn Square was Seattle-First's agent because it was *indebted* to Seattle-First. This rela-

**16.** *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d    111, 114–115 (2nd Cir.1982).

tionship certainly does not constitute an agency in law. Alternatively, defendants seem to allege that Penn Square was an agent because of its "brokering" activities. Yet these activities, from the description in the counterclaim, appear to have been conducted on behalf of Penn Square's "customer-promoters," such as Well Services and Ramco, to the detriment of Seattle-First and other lenders. This is not to say that the facts alleged would be sufficient to support a fraud claim by Seattle-First against Penn Square or Well Services, but only to indicate the difficulty the pleading presents Seattle-First in determining just what it is accused of.

The counterclaim repeatedly describes Penn Square as "the agent of, broker for, and/or coventurer with SeaFirst." This, in itself, is some evidence that the defendants also do not have a clear idea of what the relationship is. It does not constitute pleading with particularity an agency basis for fraud liability, and smacks of a desire to use discovery to find such a relationship.

The defendants also make repeated use of the words "fund" and "finance" in their attempt to conjure an appearance of wrongdoing on the part of Seattle-First. The following are a few examples:

During 1979, 1980, 1981 and the first half of 1982, PSB arranged *financing* for numerous private oil and gas and related ventures that involved substantial loans to the investors for the purchase of their interests that were *funded* by, among other financing institutions, SeaFirst.

\* \* \* \* \* \*

SeaFirst provided at least 96% of the funds involved in the *financing,* which consisted of providing 75% of the purchase price of an investor's unit(s) in the Onyx program.... The loan package that SeaFirst *funded* for the Onyx Program was typical of the *financing* meth-

ods PSB used to assist it and its customers' promotions...

\* \* \* \* \* \*

Well Services, PSB (as agent for or coventurer with SeaFirst), Ramco, Belcher and Carlstedt arranged for prospective investors to *finance* their subscriptions through loans from PSB that SeaFirst *funded* (as principle of or joint/coventurer with PSB or otherwise) ...

\* \* \* \* \* \*

In reliance upon the representations contained in the prospectus, and the oral representations described above in paragraph 18, Counter-Plaintiffs executed certain promissory notes to the order of Penn Square Bank which SeaFirst *funded* ... (emphasis added).

The counterclaim contains virtually no other explanation of what the purported funding relationship consisted of. Perusal of standard dictionaries, both legal and non-legal,[17] fails to disclose any way that the mere fact that Seattle-First "funded" the notes it now sues upon could make it liable for securities fraud.

▮▮▮▮ Not one occasion where Seattle-First either exerted authority over Penn Square or supplied it with money, or made any misrepresentations to the defendants or did anything whatsoever in connection with the purported fraudulent sale of the Onyx interests is ever specified in the counterclaim in terms of time, place or manner. *In United States ex rel. Joseph v. Cannon,*[18] the District of Columbia Circuit observed that:

Rule 9(b) of the Federal Rules of Civil Procedure mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *It cannot be doubted that* "[n]ormally this means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a

**17.** *See, e.g. Black's Law Dictionary* 606, 607 (5th ed. 1979); *Webster's New Third International*

*Dictionary* 921 (1961).

**18.** 642 F.2d 1373 (D.C.Cir.1981).

consequence of the fraud." [19] (emphasis added).

Defendants have at some length detailed the content of the misrepresentations they allege were made to them, and the consequences. However, they have failed entirely to allege facts and circumstances, other than generalities that appear to apply to any up-stream bank doing business with Penn Square during the four year period preceding its collapse, that would connect Seattle-First with the making of these misrepresentations in any way. This fact is well illustrated by the opening sentences of Count I of the counterclaim:

> 18. The prospectus disseminated to Counter-Plaintiffs and others, by Well Services, Ramco, Belcher, Carlstedt, and Carlstedt-Assoc., and their agents, contained representations ...

Neither Penn Square nor Seattle-First is even named as an actor in the making of the alleged misrepresentation. The same is true of Counts III, IV, VII, and IX. These counts must be dismissed outright, for at the very least Rule 9(b) entitles each party accused by a pleading to be apprised of the specific allegations directed against him as an individual. As was said in *Adair v. Hunt International Resources Corp.*,[20] cited in defendant's own brief: "The pleading rules not only [require] notice of the activities complained of, but also, where multiple defendants are alleged to have participated in the fraud, reasonable notice of the part each defendant is to have played in the scheme."

■ Counts V, VI and VIII of the counterclaim each contain, with minor variations, the following language: "The activities complained of in this Count constitute the offer and sale of the securities of the Onyx program by Well Services, PSB, SeaFirst, Ramco, Carlstedt, Carlstedt-Assoc. and Belcher to Counter-Plaintiffs by means of ..." These Counts must also be dismissed, since, as to Seattle-First, "the activities complained of" were never alleged. To repeat: the counterclaim con-

tains not one instance of an allegation that Seattle-First at any specific time or place, and in any specified manner, participated in the offer or sale of the Onyx securities.

The essence of the defendants' entire attack on Seattle-First seems to lie in Count II. There they attempt to implicate Seattle-First as an aider and abettor of the fraud allegedly committed by others:

> By furnishing at least 96% of the monies used to fund the loans advanced to the Onyx investors in the fashion set forth above, SeaFirst materially and substantially caused the violations of § 10b and Rule 10b–5 described above to occur because the Onyx program could not have been formed except and unless such credit was made available to PSB, the primary lender to and creditor of Wells Services and Ramco, to be ultimately advanced to prospective investors in Onyx to induce them to subscribe to units in Onyx. Had such funds not been made available, Wells Services, PSB, Ramco, Belcher, Carlstedt, Carlstedt-Assoc. would have been unable induce [sic] sufficient numbers of persons willing to invest enough money aggregate [sic] the minimum subscription proceeds required to form the program.

This claim is fatally defective for the reasons of vagueness and non-particularity discussed above. But, in addition to the fact that the defendants have failed to adequately define their use of the word "fund" and have failed to provide even one specific example of what they intend, the quoted passage plainly reveals that Seattle-First is not even a secondary actor under the facts described. The money which Seattle-First is alleged to have provided was *used* to fund the loans to the investors. In other words, defendants are attempting to hold Seattle-First liable on a claim that it aided and abetted an aider and abettor, namely Penn Square.

■ The notion that aiding and abetting securities fraud constitutes a justiciable vi-

---

**19.** *Id.* at 1385 quoting 2A J. Moore, *Federal Practice* ¶ 9.03, at 9–20 to 9–24 (2d ed. 1980).

**20.** 526 F.Supp. 736, 744 (N.D.Ill.1981).

olation of law is itself a questionable assertion. *Little v. Valley Nat. Bank of Arizona*,[21] for some reason cited by defendants as *support* for this claim, notes that "The status of aiding and abetting as a basis for liability under the securities laws is in some doubt." [22] That case did not reach the issue, however. The one case defendants cite which does seem to offer support for such liability, *Tucker v. Janota*,[23] is entirely distinguishable from the present circumstances in that it involved banks that were directly involved with both the investors defrauded and with the party making the misrepresentations. In addition, in *Tucker* there had clearly been specific allegations of the banks' involvement in the transactions, and the court was not faced with any Rule.9(b) problems. In the present case, where the allegations against Penn Square, a non-party to the action, would themselves be deficient under Rule 9(b), and the liability proposed for Seattle-First is only parasitic upon them, there is clearly no ground for this court to deny the motion to dismiss.

■ Count XI of the counterclaim is the least clear of all. Defendants in a totally conclusory manner assert that their execution and delivery of the promissory notes to Penn Square constituted the sale of a security to Seattle-First. Whatever merit that sort of theory might have in a properly pleaded claim is clearly not present here.

■ Count X is the only count remaining. In it defendants assert that Well Services and Penn Square as promoters of the Onyx program had fiduciary duties to the investors, and then in the next paragraph allege that Well Services, Penn Square *and* Ramco, Belcher, Carlstedt, Carlstedt-Assoc. *and* Seattle-First *violated* such fiduciary

duties. How Seattle-First can be alleged to have violated duties it is not alleged to have had is not clear. The court is not inclined to find that the defendants have a satisfactory counterclaim based upon such incoherent pleading.

## Conclusion

■ The court finds no evidence in the record that Seattle-First has violated any rules or regulations of the Securities and Exchange Commission, any portion of the Securities and Exchange Act of 1934 or any other federal or state law. The court further finds no proof that Seattle-First had any involvement whatsoever in the offer and sale of interests in the Onyx Private Drilling Program, Ltd.—1981, and no reason to believe that either the counterclaim in this action or the defendants' Florida complaint were ever interposed for any purpose other than to harass Seattle-First's antecedent efforts to collect on the notes defendants admit they executed. Sound reasoning and common sense dictates that the counterclaim defendants filed in this court totally fails to meet the standard imposed by Fed.R.Civ.P. 9(b), and that Seattle-First's motion to dismiss must therefore be granted.

■ Although the counterclaim filed by the defendants except Carlstedt and Puckett names several parties other than Seattle-First as counter-defendants,[24] the record in this case does not show that the pleading was served on any of them as required by Fed.R.Civ.P. 5. In the absence of such proper service, this court does not have *in personam* jurisdiction over those parties to adjudicate the issues raised in the counterclaim.[25] This is true even for

---

**21.** 650 F.2d 218 (9th Cir.1981).

**22.** *Id.* at 220 n. 3.

**23.** 1979 C.C.H.Sec.Rep. ¶ 96701 (N.D.Ill.1979).

**24.** The other parties are Ramco Exploration, Inc., f/k/a Onyx Resources, Inc., Leroy Belcher, James Carlstedt, and Carlstedt & Associates, Inc. It should be noted that the "counterclaim", as such, is improperly labeled as to Carlstedt. Under Fed.R.Civ.P. 13(g) a claim by one party

against a co-party is a crossclaim, not a counterclaim. This mislabeling is not of itself fatal, however. *See Falciani v. Philadelphia Transportation Co.*, 189 F.Supp. 203 (E.D.Penn.1960) and 6 Wright & Miller, *Federal Practice and Procedure* § 1431 (1971).

**25.** *American Telephone and Telegraph Co. v. Merry*, 592 F.2d 118, 126 (2nd Cir.1979).

Carlstedt, who *is* within the personal jurisdiction of this court for the purposes of Seattle-First's complaint against him.[26] The defendants' counterclaim must therefore be dismissed as to all parties.

Appendix A, attached hereto and made a part of this opinion treats a number of exhibits filed in these cases.

Based upon this opinion, the court will prepare and file an appropriate order, judgment and decree.

## APPENDIX A

### Findings of Fact

From a careful reading of all the pleadings filed, including the prospectus admitted into evidence by defendants as Exhibit "A" (hereinafter "Prospectus"), their answers and counterclaims, this court makes the following findings of fact as part of this memorandum opinion and order:

A. All defendants admit or have waived objection to service of process.

B. The defendants, in ¶ 16 of the counterclaims filed by Carlstedt and Puckett and ¶ 22 of the counterclaim filed by the other defendants, all admit that they entered into and executed the limited partnership agreement of the Onyx Private Drilling Program, Ltd.—1981.

C. The Onyx limited partnership agreement in express terms states that it embodies the full and complete agreement of the parties (Article 10.05, Prospectus, page B–38).

D. The Onyx limited partnership agreement also provides that all its terms and provisions are to be construed under the laws of the State of Oklahoma and that the Uniform Limited Partnership Act of the State of Oklahoma is to govern the partnership aspects of the agreement.

E. The defendants, to be participants in the Onyx Private Drilling Program, Ltd.—1981, were each required to certify and warrant that

1. the defendant had been furnished and had read a copy of the Onyx prospectus. (Prospectus, page C–1)

2. the defendant had a net worth of $250,000 or more and annual adjusted gross income of $65,000 or more. (Prospectus, pages 27 and C–6)

3. in evaluating the merits of investment in the Onyx program, the defendant relied on the advice of his personal tax and legal counsel or did not require the advice of such counsel to evaluate the investment, and that the defendant or his advisors had "such knowledge and experience in financial, tax and business matters to enable him to utilize the information made available to him in connection with the offering of the Units to evaluate the merits and risks of the prospective investment and to make an informed investment decision with respect thereto ...." (Prospectus, pages C–4 and C–5)

4. Ramco and Onyx afforded the defendant and his representatives, if any, "full and complete access to all information with respect to the Program and the Program's proposed operations ...." (Prospectus, page C–2)

5. the defendant specifically had read the portions of the offering circular detailing the risks of the investment and was aware that investment in the program was speculative and involved a high degree of risk, that the limited partners financing their program subscriptions were to be personally liable for the full amount of the subscriptions, and that Ramco and Onyx had no prior experience in oil and gas investment management. (Prospectus, pages C–2 and C–3)

F. The defendants Carlstedt and Puckett admit in their answers that they executed and delivered to Penn Square the notes upon which Seattle-First sues them, and admit that these notes were assigned to Seattle-First.

G. The defendants other than Carlstedt and Puckett, though stating in their answer (¶ 3) that they "are without knowl-

---

**26.** *Id.*

edge" of Seattle-First's allegations that they executed the notes involved here, clearly confess that they did so in the allegations of their counterclaim.[27] The court accordingly finds that each defendant did sign, execute and deliver the note in each case to Penn Square.

H. Each note signed by a defendant provided:

1. That the note was to be construed according to the laws of Oklahoma.

2. That the borrower would pay the reasonable costs of collection, including an attorney's fee, of all sums due upon default.

3. That the notes were to bear interest both before and after maturity.

4. That the note was secured by an assignment of 100% of the borrower's interest in the Onyx Private Drilling Program, Ltd.—1981.

5. That the date of the note was November 11, 1981.

The question of whether or to what extent the defendants are actually liable on the notes is still open for the court to determine upon proper notice and hearing.

I. The style of the case and the principal amount stated on the face of the note involved in each case are as follows:

SEATTLE–FIRST NATIONAL BANK
PLAINTIFF,
vs.

| CASE NO. | DEFENDANT(S) | PRINCIPAL AMOUNT ON FACE OF NOTE |
|---|---|---|
| CIV–83–2425–B | James Carlstedt | $112,500 |
| 83–2426 | Joseph Zappala | 112,500 |
| 83–2427 | Robert Vollmer | 150,000 |
| 83–2428 | W. H. Erwin | 150,000 |
| 83–2483 | Albert J. Burnett | 37,500 |
| 83–2484 | Contemporary Sales, Inc. | 112,500 |
| 83–2485 | James L. Erb | 75,000 |
| 83–2486 | Thomas Hastings | 75,000 |
| 83–2487 | Martin Itzler | 150,000 |
| 83–2488 | Roy C. Mallady, Jr. | 75,000 |
| 83–2544 | Carl Anderson | 112,500 |
| 83–2545 | Thomas R. Busard, M.D. | 112,500 |
| 83–2546 | Bill Carlson | 75,000 |
| 83–2547 | David A. Kennedy | 75,000 |
| 83–2548 | Bernard Edwards | 112,500 |
| 83–2549 | Julian H. Lifsey, Jr. | 112,500 |
| 83–2550 | Lawrence P. Frailberg | 75,000 |
| 83–2551 | I. H. Miller | 52,500 |
| 83–2553 | Michael H. Frost | 75,000 |
| 83–2554 | Roy A. Mitchell | 75,000 |
| 83–2555 | William L. Gray, III | 75,000 |
| 83–2556 | John E. Murphy | 75,000 |
| 83–2557 | Norman C. Schultz | 75,000 |
| 83–2558 | M. E. Murphy | 75,000 |
| 83–2559 | Vincent M. Tedone | 112,500 |
| 83–2560 | Terrace Paul | 75,000 |
| 83–2561 | David Elmer Ward and Martha C. Ward | 112,500 |
| 83–2562 | Nile Rodgers | 112,500 |
| 83–2563 | David E. Ward, Jr. | 75,000 |
| 83–2564 | Myron W. Wheat, Jr., M.D. | 75,000 |

**27.** ¶ 62 of the counterclaim states: "In reliance upon the representation contained in the prospectus, and the oral representations described above in paragraph 18, Counter-Plaintiffs executed certain promissory notes to the order of Penn Square Bank which SeaFirst funded; copies of the notes are annexed to the several Complaints filed herein by SeaFirst."

| | | |
|---|---|---|
| 83–2565 | W. G. Scoggins, M.D. | 75,000 |
| 83–2566 | Marvin A. Weathers | 75,000 |
| 83–2567 | Paavo Ensio | 75,000 |
| 83–2568 | Walter Larson | 150,000 |
| 83–2632 | S. Lee Puckett Management Company and | |
| | S. Lee Puckett | 75,000 |

---

## ON MOTION TO AMEND COUNTERCLAIM

The court has received the application of all defendants except Carlstedt, Puckett and Puckett Management to amend their counterclaim [1] and has carefully read the proposed amended counterclaim. The court finds that the proposed amended pleading contains no new allegations that would bring the counterclaim within the limits of Fed.R.Civ.P. 9(b) and is no different in reality from the original. The defendants still place their primary emphasis on the alleged status of the plaintiff, Seattle-First National Bank [Seattle-First] as an aider and abettor of those who allegedly made fraudulent misrepresentations to induce the defendants to purchase interests in the Onyx Private Drilling Program, Ltd.—1981. There is still no allegation of even a single instance when Seattle-First had direct contact with the defendants prior to its first attempts to collect on the notes involved herein in July of 1983, some nineteen months after defendants executed the notes and purchased their interests in Onyx. Defendants even admit that Seattle-First had no interest in these notes until December 16, 1981—more than two weeks after they were signed.

Though defendants have explained in more detail their suspicion that the loans and their purchase of the Onyx interests were not final until Seattle-First bought its participation in the loans, this suspicion remains just that—a mere conclusory suspicion unsupported by a single allegation of any particular occasion when Seattle-First knowingly assisted Penn Square Bank or the Onyx promoters to deceive these defendants in any way. Such vague suspicions are insufficient to meet the particularity requirements of Rule 9(b).

Defendants' further attempt to salvage their counterclaim by recasting the relationship of Seattle-First to the Onyx transactions as being one of "underwriter-in-fact" is ludicrous. Pertinent are the following criticisms applied to a similar contention in *Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 535–36 (S.D.N.Y.1977):

> Yarvis also contends that nondisclosure of State Mutual's "underwriter-promoter" role amounted to a violation of Rule 10b–5 (Amended Brief at 120, et seq). At this reading, the underwriter claim is a fanciful machination, advanced with frightening nonchalance. In its articulation, plaintiff's counsel misstates the law and misrepresents reported cases.
>
> In developing the claim, counsel makes no reference to the relevant statutory provision § 2(11) of the '33 Act, 15 U.S.C. § 77b(11). Section 2(11) provides, in pertinent part, that:
>
> "The term, 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells

---

1. The defendants were late in filing their application and, after obtaining oral permission from the court to late-file an application to amend their counterclaim, tendered instead a combined application for leave to amend both their answer and their counterclaim. The court will treat this application as concerning only the counterclaim. The issues raised by the original answer have already been joined and set for trial. The proposed amended answer, besides containing a late demand for jury trial which the court has denied by an order dated May 11, 1984, contains nothing which the court finds necessary to meet the ends of justice.

for an issuer in connection with the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking ..."

*It is apparent that to be an underwriter within the meaning of the '33 Act, one must participate, in some manner, in the distribution of securities to the public.* But neither plaintiffs nor their counsel have alleged that State Mutual ever purchased a Black Watch security—either from Black Watch or an intermediate underwriter—*with an eye to public redistribution.* Nor has it been argued (much less pleaded) that State Mutual ever sold a Black Watch security, or acted on behalf of Black Watch by paving the way for a public sale. *In short, it emerges that counsel has confused the colloquial meaning of the word "underwriter"—a backer of lender—with the statutory definition of that term.* Counsel's claim rests entirely on a Joycean—and largely incorrect—analysis of a loan agreement ....

Even if counsel's characterization of the loan agreement were correct—it is not—his underwriter allegation would fail as a matter of law. He has not alleged any activity by State Mutual that would bring it within the meaning of the term, as it appears in the statute and as it has been interpreted by case law. *An underwriter buys securities directly or indirectly from the issuer and resells them to the public, or he performs some act (or acts) that facilitates the issuer's distribution.* He participates in the transmission process between the issuer and the public. *See Securities Exchange Commission v. Management Dynamics, Inc.,* 515 F.2d 801, 810 (2nd Cir.1975); *Securities Exchange Commission v. North American Research and Development Corporation,* 424 F.2d 63, 72, 81 (2nd Cir.1970); *United States v. Wolfson,* 405 F.2d 779, 782 (2nd Cir.1968); *Securities Exchange Commission v. Culpepper,* 270 F.2d 241, 246 (2nd Cir.

1959); *Securities Exchange Commission v. Chinese Consol. Benev.,* 120 F.2d 738, 739, 741 (2nd Cir.1941).

At the very best, counsel's allegations amount to a charge that, as a lender, State Mutual stood behind Black Watch. *Every creditor stands behind his debtor; but to prove that someone is a creditor cannot—in and of itself—suffice to establish a claim that someone is an underwriter.* (emphasis added)

*See also G. Eugene England Foundation v. First Federal Corp.,* 663 F.2d 988, 989 (10th Cir.1973) ("An underwriter is one who has purchased stock from the issuer with an intent to resell to the public.")

To be sure, *Ingenito* is distinguishable from the present case in some respects: the present defendants use the "underwriter" ploy not in connection with their allegations that the relationship between Seattle-First and Onyx was misrepresented, but rather to conjure fiduciary duties owed by Seattle-First to the defendants. Nonetheless, it is clear that the defendants do not understand the meaning of the word "underwriter" in a securities law context. In the present case there are absolutely no allegations that Seattle-First ever purchased Onyx securities with a view toward reselling them to the public or that it ever participated to any extent in the distribution of these partnership interests. Lest there be any confusion, it should be explained that Seattle-First's purchase of a participation in the notes used to pay 75% of the purchase price of the Onyx interests after the notes were executed is not the same as participating either directly or indirectly in the distribution of those interests.

A somewhat similar circumstance arose in *Getz v. Central National Bank of Greencastle,* 147 Ind.App. 356, 261 N.E.2d 81 (1970). There a cattle feeding operation (NFP) sold cattle, either by the head or by undivided share to investors under an agreement that provided for NFP to feed out the cattle and sell them, distributing the profits pro-rata to the investors. A bank had agreed to make loans to investors

in NFP's operation and to serve as escrow agent for the collection and payment of the profits. There was no registration of anything pertinent to these transactions under applicable state or federal securities laws. One of the cattle deals went bad and lost money. The investors sued both NFP and the bank, charging violation of the securities laws. The trial court found against NFP but for the bank. The Appellate Court of Indiana affirmed and held that the trial court's determination that the bank was not an underwriter of the investment contracts was not error. In support of its conclusion, the appellate court cited the following findings of fact made by the trial court:

> *As a lender of money the Bank performed only a normal banking function.* The Bank neither expected nor realized any profit or other consideration out of the transaction other than the normal interest charges on its loan. The Bank had no direct or indirect control over NFP.... The Bank was not, in fact, indispensible or necessary to the transaction, since other sources of credit were available to participants wishing credit, and the making of a bank loan was not a necessary part of the cattle feeding agreement. (emphasis added).

*Id.* 261 N.E.2d at 85. If the bank making the loans in *Getz* was not an underwriter, then surely an upstream bank that bought a participation in those loans would not have been an underwriter. Yet that is precisely the position of Seattle-First in the present case. At the very least there have been no allegations that Seattle-First sought or could expect to realize any profit other than normal interest on the Onyx loans, no allegations that Seattle-First ever exercised control over the Onyx partnership or its promoters, and it is clearly not the case that the Penn Square loans were the only permissible sources of credit to the defendant investors. The defendants in fact have never denied Seattle-First's allegation in an earlier brief that some of the Onyx investors (obviously none of those who are defendants in this action) obtained their interests with*out* Penn Square financing. (See Seattle-First's Memorandum in Support of Motion to Dismiss Counterclaim at page 6.) This court cannot allow the defendants to file an amended counterclaim that so grossly misstates the law as to call Seattle-First an "underwriter" of the Onyx securities.

The quotation from the *Getz* case points out another very important fact that defendants with all their efforts have attempted to obscure. The lending of money is a normal banking function as is the purchase of participations in loans made by other banks. Without these entirely ordinary banking activities, our economy simply would not exist. Public policy dictates that sophisticated investors such as these defendants not be allowed to harass on fanciful bases financial institutions which are merely performing the functions that society and the law have created for them.

The court is inclined to believe from the material the defendants have offered that they have failed to understand the import of this court's citation of *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975) in its previous Opinion and Order dismissing their original counterclaim:

> in the field of federal securities laws governing disclosure of information even a complaint which may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment.

The court did not cite this passage to encourage defendants to proceed in the manner described. Specifically, this court cited *Blue Chip* and *In Re Commonwealth Oil/Tesoro Petroleum Corporation Securities Litigation*, 467 F.Supp. 227, 250 (W.D.Tex.1979) as support for the proposition that the purpose of Rule 9(b) is, in part, to prevent the filing of meritless secu-

rities fraud claims which the filing party subsequently fleshes out by conducting fishing expeditions under the liberal federal discovery rules. As the *Tesoro* court stated: "A plaintiff in a non-9(b) suit can sue now and discover later what his claim is, but a Rule 9(b) claimant must know what his claim is when he files it." *Id.* Despite this clear warning, the defendants' application for leave to amend their counterclaim blatantly states: "The results of matters obtained through discovery have been the basis for preparation of proposed Amended ... Counter-Claims herein, which are tendered herewith for leave of Court for filing."

Under such circumstances, to permit these defendants to file their proposed amended counter-claim in this action would render Rule 9(b) a nullity. Accordingly, the Application for Leave to Amend Counter-claim of the defendants, except Carlstedt, Puckett and Puckett Management, is hereby denied.

The Clerk is ordered to receive the proposed amended counterclaim into each file in these consolidated cases solely for purposes of the appellate record. The pleading will receive no further consideration by this court in its disposition of these cases.

Pursuant to Fed.R.Civ.P. 54(b), this order is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

IT IS SO ORDERED.